**No. 20-2205**

# In the United States Court of Appeals for the Federal Circuit

———————————

IN RE: STEVE ELSTER,
*Appellant.*

———————————

On Appeal from the United States Patent and Trademark Office
Trademark Trial and Appeal Board, Serial No. 87749230

———————————

## OPENING BRIEF OF APPELLANT

———————————

JONATHAN E. TAYLOR
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*jon@guptawessler.com*

*Counsel for Appellant*

February 3, 2021

## CERTIFICATE OF INTEREST

As required by Federal Circuit Rule 47.4, I certify the following:

1.    The full names of all parties represented by me are: Steve Elster.

2.    The names of the real parties in interest, if different from the parties named above, are: Not applicable.

3.    There are no parent corporations or publicly held companies that own 10% or more of the stock of any party represented by me.

4.    The names of all law firms and the partners and associates that are expected to appear in this Court are:

> JONATHAN E. TAYLOR
> GREGORY A. BECK
> GUPTA WESSLER PLLC
> 1900 L Street NW, Suite 312
> Washington DC 20036

5.    Appellant knows of no pending matters in this or any court that will directly affect or be directly affected by this Court's decision in this appeal.

Dated: February 3, 2021

> /s/ Jonathan E. Taylor
> JONATHAN E. TAYLOR
> GUPTA WESSLER PLLC
> 1900 L Street NW, Suite 312
> Washington, DC 20036
> (202) 888-1741
> (202) 888-7792 (fax)
> jon@guptawessler.com

i

# TABLE OF CONTENTS

Certificate of interest ............................................................ i

Table of authorities............................................................iv

Statement of related cases....................................................ix

Introduction...................................................................... 1

Jurisdictional statement ......................................................4

Statement of the issue .........................................................4

Statement of the case ..........................................................4

    I.    Statutory background ........................................4

    II.    Procedural background........................................ 11

Standard of review............................................................14

Summary of argument.......................................................14

Argument.......................................................................18

    I.    Because section 2(c) imposes a content-based and speaker-based burden on private speech, it is subject to at least intermediate First Amendment scrutiny under *Central Hudson*. ..............................18

        A.    Section 2(c) implicates the First Amendment because it is a content-based and speaker-based regulation of speech. ...........18

        B.    Section 2(c) must at least be subjected to intermediate scrutiny under *Central Hudson*. ......................................20

    II.    Section 2(c) cannot survive intermediate scrutiny under *Central Hudson* because it advances no legitimate governmental interest and is dramatically overbroad...........................................24

        A.    Section 2(c) restricts protected speech, including political criticism, that is neither unlawful nor realistically capable of misleading anyone. .............................................. 25

B.    The government has no legitimate interest in refusing to register trademarks that identify public figures without implying any endorsement.............................................31

C.    Section 2(c) does not materially advance the government's interest in protecting either privacy or publicity......................39

D.    Section 2(c) is far more extensive than necessary to serve any legitimate governmental interest in protecting publicity rights. .......................................................42

III.    The denial of registration of the proposed mark cannot be saved from unconstitutionality by analogizing the principal register to a government subsidy or a limited public forum. ..............................44

Conclusion.....................................................................................49

Addendum

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart v. Rhode Island,*
  517 U.S. 484 (1996) ...................................................................25, 39

*American Foundries v. Robertson,*
  269 U.S. 372 (1926) ................................................................. 4, 5, 6

*Autor v. Pritzker,*
  740 F.3d 176 (D.C. Cir. 2014).......................................................46

*Bates v. State Bar of Arizona,*
  433 U.S. 350 (1977) ......................................................................... 25

*Beckwith v. Commissioner of Patents,*
  252 U.S. 538 (1920) ...........................................................................6

*Bridgestone/Firestone Research, Inc. v. Automobile Club de l'Ouest de la France,*
  245 F.3d 1359 (Fed. Cir. 2001)........................................................8

*Buffett v. Chi-Chi's, Inc.,*
  226 U.S.P.Q. 428 (T.T.A.B. 1985).....................................................8

*Canovas v. Venezia, 80 S.R.L.,*
  220 U.S.P.Q. 660 (T.T.A.B. 1983) ............................................. 10, 32

*Cardtoons, L.C. v. Major League Baseball Players Association,*
  95 F.3d 959 (10th Cir. 1996).....................................................*passim*

*Carey v. Brown,*
  447 U.S. 455 (1980)..........................................................................41

*Central Hudson Gas & Electric Corp. v. Public Services Commission of New York,*
  447 U.S. 557 (1980) ........................................................................ 24

*Cincinnati v. Discovery Network, Inc.,*
  507 U.S. 410 (1993) ....................................................................... 27

*Cornelius v. NAACP Legal Defense & Education Fund, Inc.,*
  473 U.S. 788 (1985).........................................................................48

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ......................................................... 25, 31

*ETW Corp. v. Jireh Publishing, Inc.,*
    332 F.3d 915 (6th Cir. 2003) ............................................. 8, 30

*Fanta v. The Coca-Cola Co.,*
    140 U.S.P.Q. 674 (T.T.A.B. 1964) .................................... 10, 33

*Florida Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995) ............................................................... 32

*Gertz v. Robert Welch,*
    418 U.S. 323 (1974) .............................................................. 34

*Good News Club v. Milford Central School,*
    533 U.S. 98 (2001) ............................................................... 48

*Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,*
    202 F.2d 866 (2d Cir. 1953) ............................................... 40

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988) ................................................... 26, 27, 34

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) ................................................... *passim*

*In re Adco Industries-Technologies, L.P.,*
    2020 WL 730361 (T.T.A.B. 2020) ............................... 3, 10, 28

*In re Brunetti,*
    877 F.3d 1330 (Fed. Cir. 2017) ...................................... *passim*

*In re Hoefflin,*
    97 U.S.P.Q.2d 1174, 2010 WL 5191373 (T.T.A.B. 2010) ................................... *passim*

*In re Masucci,*
    179 U.S.P.Q. 829 (T.T.A.B. 1973) ...................................... 29

*In re RMJ,*
    455 U.S. 191 (1982) ..................................................... 25, 28, 42

*In re Tam,*
    808 F.3d 1321 (Fed. Cir. 2015) ........................................................ *passim*

*In re Trade-Mark Cases,*
    100 U.S. 82 (1879) ............................................................................ 5

*James Burrough Ltd. v. Sign of Beefeater, Inc.,*
    540 F.2d 266 (7th Cir. 1976) ............................................................ 5

*Lamparello v. Falwell,*
    420 F.3d 309 (4th Cir. 2005) ............................................................ 30

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ........................................................................... 39

*Martin v. Carter Hawley Hale Stores, Inc.,*
    206 U.SP.Q. 931 (T.T.A.B. 1979) ................................................ 10, 26

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) .............................................................. *passim*

*New York State Association of Realtors, Inc. v. Shaffer,*
    27 F.3d 834 (2d Cir. 1994) ................................................................ 32

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ........................................................................... 27

*O'Brien v. Pabst Sales Co.,*
    124 F.2d 167 (5th Cir. 1941) ............................................................ 40

*Perry Educational Association v. Perry Local Educators' Association,*
    460 U.S. 37 (1983) ............................................................................. 23

*Pittsburgh Press Co. v. The Pittsburgh Commission on Human Relations,*
    413 U.S. 376 (1973) ........................................................................... 26

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) ........................................................................... 23

*Reed v. Bakers Engineering & Equipment Co.,*
    100 U.S.P.Q. 196 (T.T.A.B. 1954) .................................................... 29

*Reed v. Town of Gilbert, Arizona,*
    576 U.S. 155 (2015) ............................................................ 19, 24

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995) .................................................................... 43

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ..................................................................... 45

*Shapero v. Kentucky Bar Association,*
    486 U.S. 466 (1988) ............................................................... 25, 31

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ............................................................. *passim*

*South Dakota v. Wayfair, Inc.,*
    138 S. Ct. 2080 (2018) ............................................................... 45

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) .................................................................. 22

*University of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co., Inc.,*
    703 F.2d 1372 (Fed. Cir. 1983) .................................... 7, 32, 33, 43

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ................................................................... 25

*White v. Samsung Electronics America, Inc.,*
    989 F.2d 1512 (9th Cir. 1993) ................................................... 39

*Zacchini v. Scripps-Howard Broadcasting Co.,*
    433 U.S. 562 (1977) ..................................................... 33, 36, 37, 41

**Statutory and regulatory materials**

15 U.S.C. § 1052(a) ............................................................................ 7

15 U.S.C. § 1052(c) ................................................................... *passim*

15 U.S.C. § 1071(a) ............................................................................ 4

15 U.S.C. § 1114(1)(a) ........................................................................ 6

Trade-mark Act of 1905,
  33 Stat. 724 ................................................................................... 5

37 C.F.R. § 2.145 ................................................................................. 4

S. Rep. No. 79–1333 ..................................................................... 6, 7

Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the
  House Comm. on Patents, 76th Cong., 1st Sess. 18–21 (1939) ........................... 9, 39

Trademark Manual of Examining Procedure § 1206 (Oct. 2018),
  https://perma.cc/V2JQ-WDAM .............................................. 8, 9, 19

## Other authorities

Stacey L. Dogan & Mark A. Lemley,
  *What the Right of Publicity Can Learn from Trademark Law*, 58 Stan. L.
  Rev. 1161 (2006) ................................................................... 36

Restatement (Third) of Unfair Competition § 46 (1995) ..................................... *passim*

The American Heritage Dictionary (5th Ed. 2020) .................................... 27

## STATEMENT OF RELATED CASES

The appellant is unaware of any cases related to this appeal.

## INTRODUCTION

This case marks the third time in six years that this Court must decide whether a statutory restriction on trademark registration complies with the First Amendment.

The first was *Tam*. In that case, the Patent and Trademark Office refused to register the name of the rock band "The Slants" based on a provision of the Lanham Act barring registration of disparaging marks. Hearing the case en banc, this Court held that the law significantly burdened private speech based on content and could not be justified under scrutiny. *In re Tam*, 808 F.3d 1321 (Fed. Cir. 2015) (en banc). The Supreme Court granted certiorari and affirmed. *Matal v. Tam*, 137 S. Ct. 1744 (2017).

Next was *Brunetti*. There, the PTO denied registration to a clothing company called "FUCT" under a neighboring provision of the Lanham Act, section 2(a)'s prohibition on immoral or scandalous marks. This Court again concluded that the prohibition significantly burdened private speech based on content and could not be justified under scrutiny. *In re Brunetti*, 877 F.3d 1330 (Fed. Cir. 2017). The Supreme Court again granted certiorari and affirmed. *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019).

Now comes Steve Elster. Invoking a memorable exchange from a presidential primary debate in 2016, he sought to register the words "Trump too small" for use on T-shirts, with an illustration of a derogatory hand gesture, to convey a political message about the then-President of the United States and his policies. The PTO refused registration, and the Trademark and Trial Appeal Board upheld the refusal.

1

The Board did so for a single reason: because section 2(c) of the Lanham Act prohibits registering any mark "identifying a particular living individual" without their written consent—a prohibition that also extends, uniquely, to "a deceased President of the United States during the life of his widow." 15 U.S.C. § 1052(c).

Section 2(c)'s prohibition, at least as applied here, is unconstitutional under this Court's cases in *Tam* and *Brunetti*. Even if the prohibition is not viewpoint-based (which was the most glaring problem with the restrictions in those cases, and the one seized on by the Supreme Court), section 2(c) burdens speech based on content and cannot satisfy scrutiny. This Court in *Brunetti* held that, "[i]ndependent of whether [a restriction] is viewpoint discriminatory," it is subject to scrutiny if it "discriminates based on content"—strict scrutiny if it "regulates the expressive components" of a mark, and intermediate (or *Central Hudson*) scrutiny if it regulates the "commercial components" of a mark. 877 F.3d at 1341, 1349. The Supreme Court did not disturb that holding, and it controls here. Section 2(c) is so poorly tailored to advance any legitimate end that it cannot survive even intermediate scrutiny under *Central Hudson*.

It is of course true that, "to the extent a trademark is confusing or misleading," the government "can protect consumers and trademark owners." *Tam*, 137 S. Ct. at 1768 (Kennedy, J.). But section 2(c) does not serve to prevent confusion or deception. Just the opposite: Those concerns are separately prohibited by section 2(a)'s bar on marks that "falsely suggest a connection with persons, living or dead"—a provision

aimed squarely at the "prevention of consumer deception." *In re Adco Indus.-Techs., L.P.*, 2020 WL 730361, at \*13 (T.T.A.B. 2020). As the Board explained below: "Unlike Section 2(a)'s explicit statutory requirement that the matter in question 'falsely suggest a connection,'" section 2(c) "applies regardless of whether there is a suggested connection" *at all*—let alone a misleading one. Appx6. The practical effect of section 2(c), then, is to target marks that do *not* confuse or mislead. The mark here is a case in point: No one would think that a product with the phrase "Trump too small" is coming from the former President himself. So the justification for section 2(c) cannot be explained in terms of preventing source confusion or false endorsement of goods.

Instead, the government has identified two interests for the law: protecting privacy and publicity. Neither is sufficient under *Central Hudson*. As for privacy, the PTO interprets section 2(c) so that it protects "celebrities and world-famous political figures," Appx6—giving them veto power over critical marks, while leaving them free to promote their own positive messages—and excludes all private figures. Any purported privacy rationale thus cannot justify the law's incursion on speech, and particularly speech about the president. As for publicity, not only is any legitimate interest addressed by section 2(a), but public officials have no right to license their identity to discourage public criticism. As Justice Alito noted in *Tam*, a restriction prohibiting registration of the mark "Buchanan was a disastrous president" would be constitutionally overbroad under *Central Hudson*. 137 S. Ct. at 1765. Just so here.

# JURISDICTIONAL STATEMENT

On July 2, 2020, the Trademark Trial and Appeal Board affirmed the PTO's refusal to register Mr. Elster's trademark. Appx1. Mr. Elster then filed a timely notice of appeal on August 19, 2020, in compliance with Federal Circuit Rule 15. Appx855. *See* 37 C.F.R. § 2.145. This Court has jurisdiction under 15 U.S.C. § 1071(a).

# STATEMENT OF THE ISSUE

The sole issue in this appeal is whether section 2(c) of the Lanham Act—which prohibits federal registration of any trademark that "[c]onsists of or comprises a name . . . identifying a particular living individual except by his written consent," or the name "of a deceased President of the United States during the life of his widow, if any, except by the written consent of the widow," 15 U.S.C. § 1052(c)—violates the First Amendment as applied to a mark containing the words "Trump too small."

# STATEMENT OF THE CASE

## I.    Statutory background

**1.** Since the nation's founding, state common law has protected trademarks by allowing mark owners a right to enjoin marks so similar "as to be likely to produce confusion." *Am. Foundries v. Robertson*, 269 U.S. 372, 380–81 (1926); *see Tam*, 137 S. Ct. at 1751. The "likelihood of confusion" requirement is central to trademark law and implicates the law's core purpose: "not to 'protect' trademarks, but . . . to protect the consuming public from confusion, concomitantly protecting the trademark owner's

right to a non-confused public." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976).

Beginning in 1870, Congress began enacting a series of laws "to establish a universal system of trade-mark registration" in the United States. *See In re Trade-Mark Cases*, 100 U.S. 82, 98 (1879); *see Tam*, 137 S. Ct. at 1752. The Trade-mark Act of 1905 authorized the "owner of a trade-mark used in commerce" to "obtain registration for such trade-mark" by filing an application with the Patent Office. 33 Stat. 724 at 724 § 1. Congress created a right to that registration, directing that "no mark . . . shall be refused registration . . . on account of the nature of such mark" unless one of several specified exceptions applied. *Id.* at 725–26 § 5. Those exceptions excluded from registration not only trademarks "likely to cause confusion or mistake in the mind of the public," but also, for example, those containing "immoral or scandalous matter." *Id.* § 5(a), (b).

In another exception, Congress first set forth the predecessor of the rule at issue here. "[N]o mark . . . shall be registered," it provided, that "consists merely in the name of an individual, firm, corporation, or association not written, printed, impressed, or woven in some particular or distinctive manner." *Id.* at 726 § 5(b). The Supreme Court read that exception narrowly in *American Foundries v. Robertson*, 269 U.S. 372. It "must be assumed," the Court wrote, that the established common-law elements of a trademark claim "were in mind when Congress came to enact the

5

registration statute." *Id.* at 381. Reading the statute in "harmony with those established principles," the Court held that the "right of registration will turn upon whether" the mark "is calculated to deceive or confuse the public." *Id.* at 381–82.

Even without federal registration, "a valid trademark may still be used in commerce" and may still be enforceable. *Tam*, 137 S. Ct. at 1753. But registration "confers important legal rights and benefits on trademark owners," including by serving "as constructive notice of the registrant's claim of ownership," and as "prima facie evidence of the validity of the registered mark" and "the owner's exclusive right to use" it. *Id.* Because the "refusal to register a mark" deprives the mark's owner of these "benefits of the statute," the Supreme Court has warned that applicants are entitled to a "fair, even liberal, construction" of the registration provisions. *Beckwith v. Commr. of Patents*, 252 U.S. 538, 546 (1920).

**2.** Congress overhauled federal trademark law in 1946 with the Lanham Act—the "foundation of current federal trademark law." *Tam*, 137 S. Ct. at 1752. The Act created a cause of action for unauthorized use "of a registered mark in connection with the sale . . . or advertising of any goods or services" if that use "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). In doing so, Congress sought to advance the core purpose of trademarks: to "protect the public from deceit" and "to foster fair competition." S. Rep. No. 79–1333, at 1274.

At the same time, Congress also reworked the registration system with the intent to "simplify registration and to make it stronger and more liberal." *Id.* at 1276. Instead, however, Congress in several ways dramatically expanded the grounds for refusing registration.

First, section 2(a) of the Lanham Act not only carried forward the Trade-mark Act's restrictions on immoral and scandalous marks, but it added a new prohibition on marks that "may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a). Both this Court and the Supreme Court held those provisions unconstitutional in *Tam* and *Brunetti*, in part because they went "much further than is necessary to serve" their purported purposes. *Tam*, 137 S. Ct. at 1765 (disparaging marks); *see Brunetti*, 139 S. Ct. 2294 (immoral or scandalous marks). As Justice Alito noted in *Tam*, the disparagement provision would restrict a mark stating that "James Buchanan was a disastrous president." *Tam*, 137 S. Ct. at 1765. Such a restriction is "far too broad" to be permissible in a law limiting expression. *Id.*

Section 2(a) also contained another new restriction on marks that "falsely suggest a connection with persons, living or dead," or with "institutions." 15 U.S.C. § 1052(c). This provision is designed to protect the "right of privacy, or the related right of publicity." *Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 1375–76 (Fed. Cir. 1983). "The right of publicity," courts have noted, "is an

7

intellectual property right of recent origin which has been defined as the inherent right of every human being to control the commercial use of his or her identity." *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 928 (6th Cir. 2003); *see also* Restatement (Third) of Unfair Competition § 46, cmt. a (1995) (noting that this right is "often described as an aspect of the 'right of privacy'").

A "false association" under section 2(a) is "distinctly different" from an infringing trademark. *Buffett v. Chi-Chi's, Inc.*, 226 U.S.P.Q. 428 (T.T.A.B. 1985). In contrast to trademark law's traditional consumer-protection function, section 2(a) is "not designed primarily to protect the public, but to protect persons and institutions from exploitation of their persona." *Bridgestone/Firestone Research, Inc. v. Auto. Club de l'Ouest de la France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001). Indeed, the Board has held that a "false association" may be established without a showing of "likelihood of confusion," "even under a theory of sponsorship or endorsement." *Buffett*, 226 U.S.P.Q. at 429.

**3.** The same "right to control the use of one's identity" that underlies section 2(a) also underlies section 2(c)—the restriction at issue here. Trademark Manual of Examining Procedure § 1206 (Oct. 2018), at 1200–08, https://perma.cc/V2JQ-WDAM. In section 2(c), Congress prohibited registration of any mark that "[c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent," as well as marks that include "the name,

8

signature, or portrait of a deceased President of the United States during the life of his widow, if any, except by the written consent of the widow." 15 U.S.C. § 1052(c).

As in section 2(a), the "purpose of requiring the consent of a living individual to the registration of his or her name, signature, or portrait" in section 2(c) "is to protect rights of privacy and publicity that living persons have in the designations that identify them." Trademark Manual of Examining Procedure § 1206. The legislative history of these two provisions, which were debated and enacted together, evinces the drafters' particular concern that the identities of presidents (and former presidents) would be used in what Congress considered to be degrading contexts. *See* Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the House Comm. on Patents, 76th Cong., 1st Sess. 18–21 (1939) (statement of Rep. Rogers) ("Abraham Lincoln gin ought not to be used, but I would not say the use of G. Washington on coffee should not be permissible."); *see also id.* (statement of Rep. Maroney) ("[W]e would not want to have Abraham Lincoln gin."). That concern appears to be the only explanation for the provision's extension of posthumous protection to ex-presidents. 15 U.S.C § 1052(c). No other deceased person receives that protection.

Unlike the 1905 Act, which permitted registration of an individual's name as long as it was presented "in a distinctive manner," section 2(c) "absolutely bars the registration" of covered marks. Trademark Manual of Examining Procedure § 1206. Section 2(c), however, "was not designed to protect every person from having a name

which is similar or identical to his or her name registered as a trademark." *Martin v. Carter Hawley Hale Stores, Inc.*, 206 U.SP.Q. 931, 933 (T.T.A.B. 1979). As the Board has recognized, "[s]uch a scope of protection would practically preclude the registration of a trademark consisting of a name" because "it is more than likely that any trademark which is comprised of a given name and surname will, in fact, be the name of a real person." *Id*. at 932. Instead, the Board has read section 2(c) as requiring "a determination of whether the mark would be recognized and understood by the public as identifying the person." *Id.* at 932–33. Thus, for example, the Board rejected a challenge by tax accountant Robert D. Fanta to the FANTA trademark because, although "undoubtedly well known in [his] own sphere[]," he would not likely be identified by consumers of Coca-Cola's soda brand. *Id.* at 933 (discussing *Fanta v. The Coca-Cola Co.*, 140 U.S.P.Q. 674 (T.T.A.B. 1964)).

For that reason, the Board considers a name to "identify" a particular living individual for purposes of section 2(c) only if the name "is of sufficient fame or reputation in the United States that, when the mark is used on applicant's goods, a connection with [the person named] would be presumed." *Canovas v. Venezia, 80 S.R.L.*, 220 U.S.P.Q. 660, 661 (T.T.A.B. 1983). Specifically, section 2(c) applies "only if . . . (1) the person is so well known that the public would reasonably assume a connection between the person and the goods or services; or (2) the individual is publicly connected with the business in which the mark is used." *In re Adco Indus.-*

*Techs., L.P.*, 2020 WL 730361, at *10 (T.T.A.B. 2020). Under that test, as the Board has applied it, "well-known individuals such as celebrities and world-famous political figures are entitled to the protection of Section 2(c) without having to evidence a connection with the involved goods or services," while "lesser-known figures" must present "evidence showing that the consuming public connects them with the manufacturing or marketing of the goods at issue." *Id.* at *11.

## II.    Procedural background

**1.** Steve Elster sought federal registration of the trademark "Trump too small" for use on T-shirts. Appx1–2. As Mr. Elster explained to the PTO, the mark is "political commentary" targeted at now-former President Donald Trump. Appx138. The mark criticizes Mr. Trump by using a double entendre. It brings to mind, on one level, his "refutation at the March 3, 2016 Republican debate of presidential candidate Marco Rubio's insinuation that [Mr. Trump] has a small penis"—an embarrassing exchange that drew considerable and harsh scrutiny by the public and press. Appx138. At the same time, the mark "is also political commentary about the smallness of Donald Trump's overall approach to governing as president of the United States and the smallness of his approach to specific issues as president." *Id.*

The PTO's examining attorney found no conflicting registered or pending marks that would bar registration under section 2(d). Appx40. Nevertheless, the PTO refused registration on two grounds.

First, the PTO refused registration under section 2(c) because the mark includes Mr. Trump's name without his consent. *Id.* As "an American businessman, television personality, politician, and the 45th President of the United States," the examining attorney wrote, Mr. Trump "is extremely well known" and "the subject of frequent media attention." Appx41, 201–02. Thus, "[u]pon encountering the applied-for mark TRUMP TOO SMALL, consumers would unequivocally associate the mark with Donald Trump." Appx201. "The fact that a mark also contains other matter, in addition to a name," the examining attorney concluded, "does not alter" section 2(c)'s requirements. *Id.* Nor does "the fact that the proposed mark may be intended as political commentary." *Id.* "[N]either the statute nor the case law carves out a 'political commentary' exception." *Id.* Because "the name 'TRUMP' in the proposed mark would be construed by the public as a reference to Donald Trump," and because Mr. Trump's "written consent is not of record," the PTO concluded that "registration must be refused pursuant to Section 2(c)." Appx202.

Second, in a separate decision, the PTO also refused registration under section 2(a) "because the applied-for mark consists of or includes matter which may falsely suggest a connection with Donald Trump, President of the United States." Appx450; *see* 15 U.S.C. § 1052(a). While acknowledging that "Donald Trump is not connected with" Mr. Elster's critical T-shirts, the examining attorney concluded that Mr.

Trump "is so well-known that consumers would presume a connection." Appx450. To establish that the "proposed mark points uniquely and unmistakably to Donald Trump," the examining attorney cited "Internet evidence showing that Donald Trump (and/or his features) have been referred to as small." Appx451–52.

**2.** Mr. Elster appealed to the Trademark Trial and Appeal Board, which affirmed under section 2(c) without reaching the section 2(a) question. The Board found it undisputed that the mark "includes the surname of President Donald J. Trump" without his written consent. Appx4–5. It cited "extensive evidence"—also undisputed—"that the public understands 'Trump' alone as a reference to" Mr. Trump. Appx4. Because "the matter sought to be registered include[s] the name of a particular living individual" without his consent—the only requirements of section 2(c)—the Board held that this section required that registration be denied. Appx3.

The Board rejected Mr. Elster's argument that the public "would not presume a connection" between the then-President of the United States and political T-shirts saying "Trump too small," in part because Mr. Trump would never endorse such a message. Appx5, 7. "Unlike Section 2(a)'s explicit statutory requirement that the matter in question 'falsely suggest a connection,'" the Board wrote, section 2(c) "applies regardless of whether there is a suggested connection." Appx6. Instead, the "key purpose of requiring the consent . . . is to protect rights of privacy and publicity that living persons have in the designations that identify them." Appx2. Given that

purpose, the Board concluded that the relevant question is not whether the public is confused, but only whether it "would perceive the name in the proposed mark as identifying a particular living individual." Appx5–6. Because Mr. Trump "is extremely well known" and had not consented to the use of his name, nothing more was required. Appx6–7. Like other "well-known . . . celebrities and world-famous political figures," the Board found that Mr. Trump was "entitled to the protection of Section 2(c) without having to evidence a connection with the involved goods or services.'" Appx6.

Having found a sufficient basis to affirm under section 2(c), the Board did "not reach the refusal to register under Section 2(a)'s false association clause." Appx6.

## STANDARD OF REVIEW

This Court gives de novo review to the Board's ultimate conclusion as to the registrability of a trademark, including the constitutionality of applying a provision of the Lanham Act to deny registration. *Brunetti*, 877 F.3d at 1337.

## SUMMARY OF ARGUMENT

**I.A.** "Trademarks are private, not government, speech." *Tam*, 137 S. Ct. at 1760. So when the government draws content- and speaker-based distinctions as to which marks may be approved for registration, it must satisfy the First Amendment.

On its face, section 2(c) imposes a content-based and speaker-based burden on speech, prohibiting the registration of any mark that "identif[ies] a particular living

individual" without consent. 15 U.S.C. § 1052(c). That alone "is sufficient to justify application of heightened scrutiny." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

**B.** In *Tam* and *Brunetti*, the Supreme Court left open the question of what level of scrutiny governs (because the challenged laws were also viewpoint-based, and thus unconstitutional regardless). But under this Court's reasoning in those cases, which the Supreme Court did not disturb, section 2(c) is subject to at least intermediate scrutiny under *Central Hudson*. As this Court held in *Brunetti*: "Independent of whether the . . . provision is viewpoint discriminatory," a content-based trademark restriction is subject to strict scrutiny if it "regulates the expressive components" of a mark, and *Central Hudson* scrutiny if it regulates the "commercial components" of a mark. 877 F.3d at 1341, 1349. Section 2(c) cannot withstand even *Central Hudson* scrutiny.

**II.** "Under *Central Hudson*, a restriction on speech must serve 'a substantial interest,'" must directly advance that interest, and "must be 'narrowly drawn.'" *Tam*, 137 S. Ct. at 1764 (Alito, J.). Section 2(c) meets none of these requirements.

**A.** As an initial matter, the statute targets constitutionally protected expression because it restricts truthful and non-misleading speech that concerns lawful activity. The statute bars registration of *any* trademark that identifies a living person without regard to whether the speech is false or misleading—and, as this case shows, it does so even in the context of political criticism of the president. Accordingly, it "clearly meets the first prong of the *Central Hudson* test." *Brunetti*, 877 F.3d at 1350.

**B.** *Central Hudson*'s second prong requires the government to demonstrate that it has a substantial interest in restricting the protected speech. It cannot do so here: Because section 2(c) is not aimed at false or misleading speech—that is the concern of *other* provisions in the Lanham Act—the government's interest in the provision has nothing to do with protecting against source confusion or false endorsement of goods.

Rather, the government's asserted interest is twofold: protecting the rights of privacy and publicity. But neither the right of privacy nor the right of publicity gives the government any substantial interest in protecting public figures—and especially the president—from marks that identify them without implying any endorsement.

**C.** Even if there were a substantial governmental interest at stake, section 2(c) would run aground on *Central Hudson*'s last two prongs, both of which are focused on fit. The third prong puts the onus on the government to prove that its restriction on speech directly and materially advances the government's substantial interests. That is an impossible task here because section 2(c) does nothing of the sort.

As interpreted by the PTO, the statute does not genuinely advance privacy interests because its application is limited to those who, like Mr. Trump, are already well known and recognized by the public. Nor does the law advance any interest in publicity. There is no evidence that restricting the use of celebrity identities in marks creates any significant incentive to engage in creative work—the purpose of the right of publicity. And that rationale would make no sense for public officials in any event.

16

**D.** *Central Hudson*'s final prong is even more problematic for the government. It assesses fit from the other direction, ensuring that the restriction does not sweep too broadly. Section 2(c) fails this requirement because it is far more extensive than necessary to serve any legitimate interest. To see why, just look at this case. The statute burdens an entire category of speech—commentary about public officials— even though the government's interests in restricting that speech are nonexistent and the First Amendment interests in allowing it are at their apex. As Justice Alito noted in *Tam*, a restriction prohibiting the mark "Buchanan was a disastrous president" would be overbroad under *Central Hudson*. 137 S. Ct. at 1765. The same is true of a restriction prohibiting "Trump too small." As a result, section 2(c) is unconstitutional, at least as applied to the proposed mark, and the Board's decision must be reversed.

**III.** That outcome cannot be avoided by comparing the trademark system to a government subsidy or a limited public forum. This Court's precedents in *Tam* and *Brunetti* foreclose any such comparison, and rightly so: The trademark system does not involve financial benefits, so its restrictions may not be upheld as mere conditions on federal spending. Nor is the federal register a limited forum. As the government itself has observed, mark holders do not communicate with their customers on the register; they do so in commerce. And if it *were* a limited forum, the same would have to be true of copyright—with staggering implications. At any rate, section 2(c) would be an unreasonable restriction even under the limited-public-forum doctrine.

# ARGUMENT

**I.    Because section 2(c) imposes a content-based and speaker-based burden on private speech, it is subject to at least intermediate First Amendment scrutiny under *Central Hudson*.**

### A.    Section 2(c) implicates the First Amendment because it is a content-based and speaker-based regulation of speech.

The first question in this appeal is whether section 2(c) regulates private speech and must therefore satisfy First Amendment scrutiny. This question was resolved by the Supreme Court in *Tam*, in which the Court unanimously held that "[t]rademarks are private, not government, speech." 137 S. Ct. at 1760. It explained that, although trademarks serve to identify the particular source of a good or service, they "often have an expressive content" as well, "consist[ing] of catchy phrases that convey a message." *Id.* at 1752, 1760. For that reason, the Court held that the government's regulation of trademarks through the Lanham Act—including its decision of which messages to accept for federal registration, and which to deny—implicates the First Amendment. The Court rejected arguments that would have "eliminate[d] any First Amendment protection or result[ed] in highly permissive rational-basis review." *Id.* at 1757. Two terms later, the Court reaffirmed this view in *Brunetti*, 139 S. Ct. 2294.

Under these precedents, section 2(c) triggers First Amendment scrutiny. "Both on its face and in its practical operation, [the] law imposes a burden based on the content of speech and the identity of the speaker." *Sorrell*, 564 at 567. "Government regulation of speech is content based if a law applies to particular speech because of

the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Section 2(c) fits that description. It expressly "defin[es] regulated speech by particular subject matter," *id.*, requiring a PTO examiner to assess the content of a proposed mark to determine whether it "[c]onsists of or comprises a name . . . identifying a particular living individual," or "the name . . . of a deceased President of the United States during the life of his widow," without consent. 15 U.S.C. § 1052(c). If so, registration is prohibited. But if not, it is permitted. That is a classic example of a content-based speech regulation.

Section 2(c) is also speaker-based. It authorizes "a particular living individual" to allow his or her name to be used in a registered mark by providing written consent. *Id.* As interpreted by the PTO, this language permits people who have achieved a sufficient degree of "fame or public recognition" to register a mark using the exact same word that is denied to everyone else—and even to express the same message. *See* Trademark Manual of Examining Procedure § 1206 (Oct. 2018), at 1200–212. President Trump, for instance, has registered countless trademarks that use his name. He could even register the very mark in this case if he wanted to do so (or more realistically, to register a mark conveying the opposite message) and section 2(c) would pose no barrier. That makes the law speaker based.

So the answer to the first question is clear: By allowing public figures to control the message that is conveyed about them in registered marks—and by prohibiting

other people from conveying a contrary message (or from speaking on the subject at all) in registered marks of their own—section 2(c) "is directed at certain content and is aimed at particular speakers." *Sorrell*, 564 U.S. at 567. And when a law "imposes a speaker- and content-based burden on protected expression, . . . that circumstance is sufficient to justify application of heightened scrutiny." *Id.* at 571; *see also id.* at 565 ("[The law] is designed to impose a specific, content-based burden on protected expression. It follows that heightened judicial scrutiny is warranted.").

### B. Section 2(c) must at least be subjected to intermediate scrutiny under *Central Hudson*.

This leads to the next question: What level of scrutiny applies? The Supreme Court left open this question in *Tam* and *Brunetti*. In both cases, the Court took a minimalist approach when explaining why the statute before it was unconstitutional. In *Tam*, "[t]he eight-Justice Court divided evenly between two opinions and could not agree on the overall framework for deciding the case," which concerned a facial challenge to section 2(a)'s prohibition on registering marks that are disparaging. *See Brunetti*, 139 S. Ct. at 2298. "But all the Justices agreed" that "the disparagement bar was viewpoint-based" and, for that reason, violated "a core postulate of free speech law: The government may not discriminate against speech based on the ideas or opinions it conveys." *Id.* at 2299. The Court applied the same rationale in *Brunetti*, holding that section 2(a)'s prohibition on registering immoral or scandalous marks "similarly discriminates on the basis of viewpoint," so "it must also collide with our

20

First Amendment doctrine." *Id.* at 2299–2302. The Court did not, however, "say anything about how to evaluate viewpoint-neutral restrictions on trademark registration" that are content-based and speaker-based. *Id.* at 2302 n*.

But this Court has twice done so. The en banc Court in *Tam* took the position that section 2(a) regulates speech "based on the expressive aspect of the speech, not its commercial-speech aspects," and "should therefore be evaluated under the First Amendment standards applicable to the regulation of expressive speech." 808 F.3d at 1355. Under those standards, the Court reasoned, "[s]ection 2(a) should be subject to strict scrutiny, and be invalidated for its undisputed inability to survive such scrutiny." *Id.* The en banc Court also concluded, in the alternative, that section 2(a) "would fail to survive" even *Central Hudson*'s "intermediate-scrutiny framework for determining the constitutionality of restrictions on commercial speech." *Id.*

The *Tam* Court explained why nothing less than intermediate scrutiny could apply—even assuming that the regulated speech were purely commercial, and even if the statute did not ban speech outright, but only burdened it. "'Commercial speech is no exception' to the need for heightened scrutiny of content-based impositions seeking to curtail the communication of particular information or messages." *Id.* at 1338 (quoting *Sorrell*, 564 U.S. at 566). "This is true whether the regulation bans or merely burdens speech." *Id.* at 1335. Because "'[l]awmakers may no more silence unwanted speech by burdening its utterance than by censoring its content,'" *id.*

(quoting *Sorrell*, 564 U.S. at 566), it is well-established that "'the Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" *Id.* (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000)). For laws regulating commercial speech, the "rigorous scrutiny" that they must satisfy has traditionally been characterized as intermediate scrutiny under *Central Hudson*.

In affirming, "the Supreme Court did not reverse or otherwise cast doubt on the continuing validity" of these "aspects of [the en banc Court's] decision in *Tam*." *Brunetti*, 877 F.3d at 1343 n.1. Indeed, Justice Alito's opinion for the Court stated that it "need not resolve" whether strict scrutiny or intermediate scrutiny applied because the statute was unconstitutional either way, and "le[ft] open the question whether *Central Hudson* provides the appropriate test for deciding free speech challenges to provisions of the Lanham Act." 137 S. Ct. at 1764.

This Court in *Brunetti* thus indicated that the en banc Court's decision in *Tam* remains binding on these points, "question[ing] the force of [the government's] assertion" that the "en banc decision in *Tam* is not binding on this panel." 877 F.3d at 1343 n.1 (citing cases refuting the government's position). But the *Brunetti* Court determined that it "need not decide whether that holding continues to bind future panel decisions in this circuit" because the Court "independently reach[ed] the same conclusion as the en banc court." *Id.* The Court further determined that it "need not resolve" whether the statute was viewpoint discriminatory because, "[i]ndependent

22

of whether [it] is viewpoint discriminatory," it "impermissibly discriminates based on content in violation of the First Amendment." *Id.* at 1341. As in *Tam*, the Court in *Brunetti* found that the law "target[ed] a mark's expressive message, which is separate and distinct from the commercial purpose of a mark as a source identifier," and "as such it should be subject to strict scrutiny." *Id.* at 1349. But, as in *Tam*, the Court in *Brunetti* also held that the statute was "unconstitutional even if treated as a regulation of purely commercial speech reviewed according to the intermediate framework established in *Central Hudson.*" *Id.* at 1350. Nothing in the Supreme Court's decision affirming the judgment indicated any disagreement on this score.

To the contrary, Supreme Court precedent provides powerful support for this Court's conclusions in both *Tam* and *Brunetti*. The Supreme Court has repeatedly explained that "[c]ontent based regulations are presumptively invalid." *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992); *see also Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "For the [government] to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling [governmental] interest and that it is narrowly drawn to achieve that end"—in other words, that it satisfies strict scrutiny. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). As the Court put it just a few years ago: "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified

only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Without question, section 2(c) is such a law.

But the Court need not go so far here. "[T]he outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Sorrell*, 564 U.S. at 571. Even if it were true that section 2(c) "at most burdens only commercial speech," *id.*, the law cannot withstand intermediate scrutiny under *Central Hudson*. *See Tam*, 137 S. Ct. at 1764 (Alito, J.) ("We need not resolve this debate between the parties because the disparagement clause cannot withstand even *Central Hudson* review."). So it may not be constitutionally applied to the proposed mark in this case.

## II.    Section 2(c) cannot survive intermediate scrutiny under *Central Hudson* because it advances no legitimate governmental interest and is dramatically overbroad.

To justify a restriction on commercial speech, *Central Hudson* requires the government to satisfy a four-part test, which asks whether (1) the speech "concern[s] lawful activity and [is] not . . . misleading"; (2) "the asserted governmental interest" justifying the law "is substantial"; (3) "the regulation directly advances" the asserted interest; and (4) the regulation "is not more extensive than is necessary to serve that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N. Y.*, 447 U.S. 557, 566 (1980). "Under a commercial speech inquiry, it is the [government's] burden to justify its content-based law as consistent with the First Amendment." *Tam*, 808 F.3d at 1355.

The government must come forward with actual evidence, not just "speculation or conjecture," that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). The government here falls far short of carrying that "heavy" burden. *44 Liquormart v. Rhode Island*, 517 U.S. 484, 516 (1996).

### A. Section 2(c) restricts protected speech, including political criticism, that is neither unlawful nor realistically capable of misleading anyone.

The first step of *Central Hudson*'s test asks whether the restricted expression falls in "the category of constitutionally protected commercial speech." *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 472 (1988). To receive "the protections of the First Amendment," the speech at issue must be "[t]ruthful advertising related to lawful activities." *In re RMJ*, 455 U.S. 191, 203 (1982). Because section 2(c) targets *any* trademark that identifies a living person without regard to whether it is misleading—and does so even in the context of political criticism of the President of the United States—the provision "clearly meets the first prong of the *Central Hudson* test." *Brunetti*, 877 F.3d at 1350.

**1.** *Central Hudson*'s requirement that speech "concern lawful activity" excludes from the First Amendment's protection "[a]dvertising concerning transactions that are themselves illegal." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 384 (1977). When commercial speech "propose[s] an illegal transaction," a "government may regulate or ban [it] entirely." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.

489, 496 (1982). Hence, the government would not violate the First Amendment, for example, by refusing to register proposed trademarks for illegal drugs or gambling. *See, e.g.*, *id.* (upholding law "expressly directed at commercial activity promoting or encouraging illegal drug use"); *Pittsburgh Press Co. v. The Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 389–90 (1973) (upholding law forbidding sex discrimination).

But section 2(c) is not such a law. It targets any mark that includes "a name, portrait, or signature identifying a particular living individual" without their consent. 15 U.S.C. § 1052(c). Rather than train its restriction on unprotected illegal advertising, the provision restricts speech at the opposite end of the commercial-speech spectrum. Because names are rarely unique, a mark can identify a "particular" person under section 2(c) only if the public would associate the mark with that person, "either because that person is so well known that the public would reasonably assume the connection or because the individual is publicly connected with the business in which the mark is used." *Martin v. Carter Hawley Hale Stores, Inc.*, 206 U.S.P.Q. 931 (T.T.A.B. 1979). This means that section 2(c) applies most strongly, as the Board put it below, to speech about "celebrities and world-famous political figures." Appx6. Far from falling entirely outside the First Amendment, "speech relating to public figures" is "[a]t the heart" of its protection. *Hustler Magazine v. Falwell*, 485 U.S. 46, 50, 52 (1988).

Applying section 2(c) to the mark in this case—a political message critical of the President of the United States—is particularly egregious. The words "Trump too

small" reference a famous moment from a 2016 primary debate involving statements by Mr. Trump about, in the Board's words, "the size of certain parts of his anatomy," while simultaneously conveying a broader opinion of Mr. Trump and his policies. Appx5 n.6; *see* "Small," The American Heritage Dictionary (5th Ed. 2020), https://perma.cc/6LLR-AVXD ("Narrow in outlook; petty: a small mind."). Such political criticism goes to the core of the First Amendment. The "right of free public discussion of the stewardship of public officials," and especially the president, is a "fundamental principle of the American form of government." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 275–76 (1964).

Even in the commercial-speech context, these "fundamental values" remain relevant when the speech at issue "actually consist[s] of core expression." *Tam*, 808 F.3d at 1374 (Dyk, J., concurring and dissenting). In other areas where speech does not ordinarily "receive much solicitude," the Supreme Court has nevertheless been "vigilant" in maintaining protections "in the area of public debate about public figures." *Falwell*, 485 U.S. at 53. Commercial speech is no different. "Advertising, though entirely commercial, may often carry information of import to significant issues of the day." *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 421 n.17 (1993). Trademarks, in particular, often "do not simply identify the source of a product or service but go on to say something more" on "some broader issue." *Tam*, 137 S. Ct. at 1764 (Alito, J.). Mr. Trump himself has registered marks that express political

27

messages, including his signature slogan MAKE AMERICA GREAT AGAIN. And the marketplace is "well stocked with merchandise that disparages prominent figures." *Id.* at 1765. Because the "line between commercial and non-commercial speech" in trademarks "is not always clear," "free speech would be endangered" if "affixing the commercial label" alone permitted suppression of such criticism. *Id.*

**2.** In addition to advertisements proposing illegal transactions, "misleading advertising" also falls outside First Amendment protection and "may be prohibited entirely." *RMJ*, 455 U.S. at 203. Like the provisions struck down in *Tam* and *Brunetti*, however, section 2(c) "does not address misleading . . . marks." *Brunetti*, 877 F.3d at 1350. Instead, its plain language "absolutely bars" registration of any mark "that identifies a particular living individual absent written consent"—whether or not that identification is actually capable of misleading anyone. *In re Hoefflin*, 97 U.S.P.Q.2d 1174, 2010 WL 5191373, at *1 (T.T.A.B. 2010).

It is possible, of course, for a trademark to use a person's name or identity in a misleading way—for example, by falsely suggesting that the person has endorsed a product. Prohibiting that sort of false endorsement is the function of section 2(a)'s separate restriction on marks that "falsely suggest a connection with persons, living or dead"—a provision aimed squarely at the "prevention of consumer deception." *See In re Adco Indus.-Techs., L.P.*, 2020 WL 730361, at *13 (T.T.A.B. 2020). But as the Board explained below: "Unlike Section 2(a)'s explicit statutory requirement that the

matter in question 'falsely suggest a connection,'" section 2(c) "applies regardless of whether there is a suggested connection" at all—much less one that is misleading. Appx6. The Board thus applies section 2(c) to refuse registrations that include a living person's name, absent their written consent, even when the suggested connection is *true*. *See, e.g.*, *Reed v. Bakers Eng'g & Equip. Co.*, 100 U.S.P.Q. 196 (T.T.A.B. 1954) (refusing registration of REED REEL OVEN because it identified the oven's designer, Paul N. Reed, without his consent).

The Board's application of section 2(c) to celebrities further demonstrates that the provision is not targeted at false or misleading speech. The Board requires written consent for registration of a trademark whenever a person identified by the mark "is so well known that the public would reasonably assume" that the name identifies that person. *Hoefflin*, 97 U.S.P.Q.2d 1174, 2010 WL 5191373, at *1. It thus refuses registration of marks containing the names of public figures—including the president—as a matter of course, without evidence that the name suggests a false endorsement. *See id.* (refusing OBAMA PAJAMA while acknowledging that "the record does not support the conclusion that President Obama is in any way connected with" the goods). Indeed, section 2(c) extends protection even to "a deceased President of the United States"—for whom endorsement would be impossible—"during the life of his widow." *See In re Masucci*, 179 U.S.P.Q. 829, 830 (T.T.A.B. 1973) (refusing the mark EISENHOWER for greeting cards during the life of his widow without her consent).

29

The Board's decision below proves the point. The Board rested its application of section 2(c) solely on evidence that "President Trump is extremely well known" and had not consented to the use of his name. Appx6–7. The fact that Mr. Trump is famous, however, does not demonstrate that consumers are likely to believe that all Trump-related political T-shirts, flags, signs, and other assorted merchandise are produced or endorsed by Trump himself. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 922 (6th Cir. 2003) ("No reasonable person could believe that merely because these photographs or paintings contain [Tiger] Woods's likeness or image, they all originated with Woods."). That is especially true here, where the mark expressly criticizes Mr. Trump. The phrase "Trump too small" and accompanying hand gesture literally belittle Mr. Trump—a message that no reasonable person would mistake as one that he would personally endorse. *See Lamparello v. Falwell*, 420 F.3d 309, 315 & n.3 (4th Cir. 2005) (noting that criticism of a mark holder "will seldom create a likelihood of confusion"); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 975 (10th Cir. 1996) ("[T]he use of celebrity names or likenesses" for parody and criticism is "not likely to confuse or deceive consumers.").

Yet the Board categorically rejected Mr. Elster's argument that "his mark does not violate Section 2(c) because the relevant public would not presume a connection between President Trump and the goods." Appx5. Section 2(c), the Board wrote, "applies regardless of whether there is" such a "public perception of a connection."

Appx6. Instead, the only question under section 2(c) is "whether the public would perceive the name in the proposed mark as identifying a particular living individual" without consent. Appx5–6. Thus, "well-known individuals such as celebrities and world-famous political figures are entitled to the protection of Section 2(c) without having to evidence a connection with the involved goods or services.'" Appx6.

Because the proposed mark thus neither relates to illegal activity nor is likely to mislead anyone, it falls within the First Amendment's protection and may be restricted only if the government can satisfy the remaining prongs of the *Central Hudson* test. *See Shapero,* 486 U.S. at 472. The government cannot make that showing here because section 2(c)'s categorical prohibition on marks that identify public figures advances no legitimate governmental interest and is drastically overbroad.

**B.    The government has no legitimate interest in refusing to register trademarks that identify public figures without implying any endorsement.**

*Central Hudson*'s second prong requires the government to demonstrate that its interest in restricting the speech at issue is not only legitimate, but "substantial." *Edenfield*, 507 U.S. at 767. Because "the *Central Hudson* standard does not permit [a court] to supplant the precise interests put forward by the [government] with other suppositions," only the specific interests asserted by the government are relevant. *Id.* at 768. The government's failure to "provide direct and concrete evidence that the

evil that the restriction purportedly aims to eliminate does, in fact, exist will doom" the law. *N.Y. State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 842 (2d Cir. 1994).

As already explained, the government's interest in section 2(c) cannot be explained in terms of preventing source confusion or false endorsement of goods. The restriction categorically applies to marks that identify any living person "without having to evidence a connection with the involved goods or services." Appx6. It thus applies even if there is no likelihood of confusion about the source of goods, or about the identified individual's sponsorship or endorsement. *See Univ. of Notre Dame Du Lac*, 703 F.2d at 1376.

Instead, "the drafters sought" in section 2(c) "to embrace concepts of the right to privacy, an area of the law then in an embryonic state." *Id.* at 1376 & n.8. In "requiring the consent of a living individual to the registration of his or her name," section 2(c) "embrace[s] two notions: a person's right to privacy and a person's right of publicity." *Canovas,* 220 U.S.P.Q. at 661; *see* Appx10 (identifying the same two interests—"privacy and publicity"—as underlying section 2(c)). Although there is significant tension between the rights of privacy and publicity, both are aspects of the "right to control the use of one's identity." *Univ. of Notre Dame Du Lac*, 703 F.2d at 1376.

Protecting one or both of these interests may, at least in some circumstances, serve as a substantial governmental objective. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (governmental "interest in protecting the privacy and tranquility" of

recent accident victims); *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977) (governmental interest in enforcing the right of publicity to "protect[] the proprietary interest" of performers). As *Tam* and *Brunetti* demonstrate, however, the First Amendment narrowly circumscribes the government's legitimate reasons for restricting speech. *See Brunetti*, 877 F.3d at 1351. Given those constitutional limits, neither the right of privacy nor the right of publicity can give the government any substantial interest in protecting public figures—and especially the President of the United States—from marks that identify them by name.

*Privacy.* Although there are many kinds of privacy rights, the "right of privacy" at issue here is a narrow one. Recognized by only a few states and rarely invoked, the right is designed to protect against "injury to personal feelings caused by an unauthorized use of the plaintiff's identity." Restatement (Third) of Unfair Competition § 46, cmt. b (1995); *see Univ. of Notre Dame Du Lac*, 703 F.2d at 1376. That already narrow interest is further drastically limited here by the fact that, as explained, section 2(c) limits its protection to those who are already known and recognized by the public. *See Martin*, 206 U.S.P.Q. 931. Truly private figures, after all, cannot be "identif[ied]" by their names alone, so they receive no protection from section 2(c). *See, e.g.*, *Fanta v. The Coca-Cola Co.*, 140 U.S.P.Q. 674 (T.T.A.B. 1964) (denying a petition by Robert Fanta, a tax accountant, to cancel Coca-Cola's FANTA mark because he was not widely identifiable by the name Fanta).

The government has no legitimate interest—much less a substantial interest—in protecting public officials and other "well-known individuals," Appx6, from hurt "feelings," Restatement (Third) of Unfair Competition § 46, cmt. b (1995). If there is an interest that is more antithetical to the First Amendment, it is hard to imagine. The First Amendment protects public discussion of "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." *Gertz v. Robert Welch*, 418 U.S. 323, 342 (1974). "The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who . . . , by reason of their fame, shape events in areas of concern to society at large." *Falwell*, 485 U.S. at 51.

"Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to vehement, caustic, and sometimes unpleasantly sharp attacks." *Id.* For example, political cartoons and parodies are frequently, like the mark here, based on exploration of "unfortunate physical traits or politically embarrassing events—an [exploration] often calculated to injure the feelings of the subject of the portrayal." *Id.* at 54. Yet, even when that "speech inflicts great pain, our Constitution protects it to ensure that we do not stifle public debate." *Tam*, 808 F.3d at 1358 (cleaned up); *see Falwell*, 485 U.S. at 51 (holding unconstitutional the tort of intentional infliction of emotional distress as applied to a public figure).

34

A claimed interest in protecting "privacy" is particularly unsupportable here, where the identifiable public figure was the President of the United States, and his name was used for purposes of political criticism. As the Board correctly concluded below, Donald Trump "is extremely well known, not only because of his political office but also because of his prior celebrity." Appx6–7. That finding should have established that the government has no interest in protecting Mr. Trump's privacy from T-shirts bearing a critical trademark. But instead, the Board relied on his status as a "world-famous political figure[]" as the *basis* for invoking section 2(c). *Id.*

That inverts the constitutional hierarchy of protected speech. While "lesser-known figures may have to show that the consuming public connects them with the manufacturing or marketing of shirts or electrodes, well-known individuals such as celebrities and world-famous political figures are entitled to the protection of Section 2(c) without having to evidence a connection with the involved goods or services." Appx6*; see also Hoefflin*, 97 U.S.P.Q.2d 1174, 2010 WL 5191373, at *2 (finding that "President Barack Obama, *because* he is the President of the United States, is so well known and famous that members of the purchasing public will . . . reasonably assume that President Obama is being identified."). And section 2(c) uniquely gives the least private name in American life—the president—even posthumous protection. No legitimate privacy interest could possibly be served by that scheme.

*Publicity.* The same goes for publicity. The parameters of the "right of publicity" vary by state, but it is commonly defined as "the right of a person to control the commercial use of his or her identity." *Cardtoons*, 95 F.3d at 967; *see also* Restatement (Third) of Unfair Competition § 46 ("One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability.").

As opposed to the related right of privacy, which is designed to protect against injury to personal feelings from an appropriation of identity, the publicity right protects those who "seek[] redress for an appropriation of the commercial value of the identity." Restatement (Third) of Unfair Competition § 46, cmt. b. The reasons for protecting that interest are elusive; courts and commentators "have cast about for years for a persuasive justification." Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 Stan. L. Rev. 1161, 1180 (2006). The result is "a slew of sometimes sloppy rationalizations," leaving courts with "little way of determining whether a particular speech limitation is necessary or even appropriate in order to serve the law's normative goals." *Id.* at 1162–63.

"The principal economic argument made in support of the right of publicity is that it provides an incentive for creativity and achievement." *Cardtoons,* 95 F.3d at 973. In *Zacchini v. Scripps-Howard Broadcasting Co.*—the only Supreme Court case to examine the publicity right—the Court described the government's interest as

"closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors." 433 U.S. at 573. As other courts have noted, however, the plaintiff in *Zacchini* complained of "appropriation of the economic value of his *performance*"—the unauthorized taping and television broadcast of his human cannonball act—rather than "the economic value of his *identity*." *Cardtoons*, 95 F.3d at 973 (emphasis added). The Supreme Court explained that "protecting the proprietary interest of the individual in his act" is comparable to other forms of intellectual-property protection because it "encourage[s] such entertainment." *Zacchini*, 433 U.S. at 573. That rationale "is obviously more compelling" than "a more typical right of publicity case" involving protection of mere references to a celebrity's name or likeness. *Cardtoons*, 95 F.3d at 973; *see also* Restatement (Third) of Unfair Competition § 46, cmt. c (describing "the rationales underlying the recognition of right of publicity" as "generally less compelling than those that justify rights in trademarks or trade secrets").

Even if such an attenuated interest could be described as "substantial," the interest would again be limited by the public's First Amendment right to criticize public figures. "There is an inherent tension between the right of publicity and the right of freedom of expression under the First Amendment"—a tension that "becomes particularly acute when the person seeking to enforce the right is a famous actor, athlete, politician, or otherwise famous person whose . . . life [is] subject to

37

constant scrutiny and comment in the public media." *ETW Corp.*, 332 F.3d at 931. Before restricting such expression, courts therefore "careful[ly] balance . . . the right of publicity and the First Amendment" to ensure that "the public's interest in . . . free expression take[s] precedence over any interest Johnny Carson"—let alone the President of the United States—"may have in a phrase associated with his person." *Id.* Specifically, because "[t]he right of publicity . . . is fundamentally constrained by the public and constitutional interest in freedom of expression," "[t]he use of a person's identity primarily for the purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity." Restatement (Third) of Unfair Competition § 46, cmt. c.

Again, section 2(c) casts aside those ordinary constitutional limits. The statute "absolutely bars" registration of a mark "that identifies a particular living individual absent written consent." *Hoefflin*, 97 U.S.P.Q.2d 1174, 2010 WL 5191373, at *1. In doing so, it broadly "restricts the communication of ideas." *Cardtoons,* 95 F.3d at 972. Because it is impossible to criticize a person without "identifying" them, section 2(c)'s requirement of "written consent" gives government officials and other public figures veto power over critical marks, while leaving them free to use the trademark system to promote their own positive messages. "The last thing we need, the last thing the First Amendment will tolerate, is a law that lets public figures keep people from

mocking them." *White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1519 (9th Cir. 1993) (Kozinski, J., dissenting). That is all the more true of presidents.[1]

## C.  Section 2(c) does not materially advance the government's interest in protecting either privacy or publicity.

The *Central Hudson* test requires the government to do more than just articulate a substantial interest—it must also demonstrate that its chosen restriction "directly and materially advanc[es]" that interest. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 555–56 (2001). A commercial-speech restriction "may not be sustained if it provides only ineffective or remote support for the government's purpose." *44 Liquormart*, 517 U.S. at 505. Section 2(c) cannot satisfy this prong either because it does not prevent consumer deception and it fails to advance any other legitimate interest.

**1.** Assuming that the right of privacy provides a substantial governmental interest, section 2(c) does nothing to further it. The right is designed to protect

---

[1] Section 2(c)'s close association with section 2(a), which prohibits marks that bring "persons, living or dead, . . . into contempt, or disrepute," suggests a different, but related, purpose. These provisions were debated and enacted together, and their history evinces a particular concern that the identities of presidents would be used in contexts thought to be demeaning. *See* Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the House Comm. on Patents, 76th Cong., 1st Sess. 18–21 (1939) (statement of Rep. Rogers) ("Abraham Lincoln gin ought not to be used, but I would not say the use of G. Washington on coffee should not be permissible."). That concern appears to be the only explanation for section 2(c)'s restriction on the use a deceased president's name. If that is the statute's real purpose, it is unconstitutional under *Tam* and *Brunetti* because it contravenes the "bedrock First Amendment principle" that speech "may not be banned on the ground that it expresses ideas that offend." *Tam*, 137 S. Ct. at 1751 (Alito, J.); *see also id.* at 1767 (Kennedy, J.).

"private person[s]" from unauthorized publicity, not those who intentionally "seek[] and receive[]" celebrity. *O'Brien v. Pabst Sales Co.*, 124 F.2d 167, 170 (5th Cir. 1941). As the Second Circuit observed long ago: "[I]t is common knowledge that many prominent persons (especially actors and ball-players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways." *Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 867 (2d Cir. 1953).

The decision below makes clear how poorly section 2(c) is designed to advance any genuine privacy interests. The Board applied the statute to protect Mr. Trump not just in spite of his status as a "world-famous political figure[]," but *because of* that status. Appx6–7. And it did so to protect him from political criticism based on his conduct at a presidential primary debate[2]—a public forum that, far from implicating his privacy, was itself a matter of significant public interest. No privacy interests are advanced by protecting Mr. Trump from additional criticism on that subject.

Again, the Board gets the relevant interests backwards. By reading the statute to exclude "lesser-known figures" who are neither generally famous nor publicly

---

[2] *See, e.g.*, *Donald Trump defends size of his penis*, CNN (Mar. 4, 2016), https://perma.cc/7ATR-45L9; *Talk of Trump's 'manhood' made Republican debate a disservice to voters*, The Guardian (Mar. 4, 2016), https://perma.cc/FY4X-Q5C4; *That Time Donald Trump Referenced His Penis Size in a Presidential Debate*, U.S. News & World Report (Mar. 3, 2016), http://bit.ly/3r3NcK0.

associated with the relevant industry, Appx6, the Board interprets away any possible privacy-based rationale, excluding from the statute's reach anyone with a legitimate interest in maintaining the privacy of her identity. Section 2(c) cannot meaningfully or directly advance any privacy interests as long as it is based on distinctions with "no bearing whatsoever on privacy." *Carey v. Brown*, 447 U.S. 455, 465 (1980).

**2.** Section 2(c) also fails to advance any interests served by the "right of publicity." To begin with, there is no evidence that "[r]estricting the use of celebrity identities" creates any significant incentive to engage in additional creative work. *Cardtoons*, 95 F.3d at 973–74 (concluding that the "incentive effect of publicity rights . . . has been overstated"); Restatement (Third) of Unfair Competition § 46, cmt. c (describing "the rationales underlying the recognition of a right of publicity" as "generally less compelling than those that justify rights in trademarks or trade secrets"). "Any additional incentive attributable to the right of publicity may have only marginal significance." *ETW*, 332 F.3d at 930.

But even assuming that the right could meaningfully and constitutionally be applied in other contexts to protect the licensing rights of celebrities, it makes no sense to extend the same right to public officials. Giving government officers a right to control the public's use of their names and identities would do nothing to help them "reap the reward of [their] endeavors." *Zacchini*, 433 U.S. at 573. Instead, they would "use that power to suppress criticism." *Cardtoons, L.C.*, 95 F.3d at 975.

**D.    Section 2(c) is far more extensive than necessary to serve any legitimate governmental interest in protecting publicity rights.**

The final prong of the *Central Hudson* test requires that the speech restriction not be "broader than reasonably necessary" to serve the substantial interest identified by the government. *RMJ*, 455 U.S. at 203. "This means, among other things, that the regulatory technique may extend only as far as the interest it serves." *Tam*, 137 S. Ct. at 1764. Section 2(c) flunks this part of the test too.

To the extent that section 2(c) is supposed to protect consumers from false or misleading trademarks, the government could achieve that goal without burdening any protected speech by simply limiting the prohibition to the use of names and identities that falsely suggest an endorsement by the identified person. But instead, section 2(c) "absolutely bars the registration of a designation that identifies a particular living individual absent written consent," including "not only full names, but also surnames, shortened names, nicknames, etc., so long as the name in question does, in fact, 'identify' a particular living individual." *Hoefflin*, 97 U.S.P.Q.2d 1174, 2010 WL 5191373, at *2. By prohibiting *all* references to a living person's name or identity—whether misleading or not—the statute is far "broader than reasonably necessary" to serve the government's legitimate interests. *RMJ*, 455 U.S. at 203.

Indeed, the government could more directly prevent deception by eliminating section 2(c) altogether and instead enforcing section 2(a)'s prohibition on marks that

"falsely suggest a connection with persons, living or dead." 15 U.S.C. § 1052. Section 2(a) appears far better tailored than section 2(c) to achieve consumer-protection goals. Not only is it limited to marks that falsely suggest an endorsement, but—unlike section 2(a)—it prohibits false claims of connection not just with people, but also with "institutions." If section 2(a) were really meant to protect consumers, it would make no sense for it to prohibit criticism of political figures—even criticism of deceased presidents during the lives of their spouses—but permit, for example, the false claim that an online course has been endorsed by the University of Notre Dame. *See Univ. of Notre Dame Du Lac*, 703 F.2d at 1376. That "overall irrationality" "bring[s] into question the [state's] purpose." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995).

Likewise, any possible governmental interest in privacy or publicity rights would be better served, with far less impact on protected speech, by excluding public figures from section 2(c)'s coverage (which is the exact opposite of how the PTO has interpreted it). Public officials have no legitimate privacy interest in being insulated from public debate, nor any legitimate economic interest in licensing it. At a constitutional minimum, a statement that is critical of a political figure should not be denied registration solely because it identifies the person criticized. As Justice Alito observed in *Tam*, a restriction barring the trademark "Buchanan was a disastrous president" would be constitutionally overbroad under *Central Hudson*. 137 S. Ct. at 1765. For the same reason, a restriction barring "Trump too small" is overbroad too.

**III.** **The denial of registration of the proposed mark cannot be saved from unconstitutionality by analogizing the principal register to a government subsidy or a limited public forum.**

Because section 2(c) fails *Central Hudson*, it is unconstitutional as applied to Mr. Elster's proposed mark, and the Board's decision must be reversed. The government may not avoid that outcome by analogizing the principal register to a government subsidy or limited public forum. That is true for three separate reasons: (1) this Court has squarely rejected both analogies; (2) these analogies are inapposite at any rate; and (3) the restriction would be unreasonable even were the analogies appropriate, at least as applied to marks expressing a political opinion about public figures.

*First*, this Court's precedents foreclose any reliance on either the government-subsidy doctrine or limited-public-forum doctrine. The government argued in *Tam* that section 2's prohibitions are "simply a reasonable exercise of its spending power, in which the bar on registration is a constitutional condition defining the limits of trademark registration," but this Court "rejected the applicability of this analysis to trademark registration, 9–3, in [its] en banc decision." *Brunetti*, 877 F.3d at 1343. "The four Justices who reached the issue in *Tam* likewise held the government subsidy framework does not apply to trademark registration," with Justice Alito's plurality opinion remarking that "no difficult question is presented here." *Id.*

In *Brunetti*, this Court indicated that its decision in *Tam* remained binding circuit precedent "because the Supreme Court did not reverse or otherwise cast

doubt on the continuing validity of our government subsidy analysis and other aspects of our decision." *Id.* at 1343 n.1. But no matter: The Court "reach[ed] the same conclusion" again, *id.*, forcefully rejecting the argument that the statute could be spared from unconstitutionality by comparing it to a government subsidy. *Id.* at 1343–45.[3] The Court further held that the public-forum framework, which gives the government leeway to draw reasonable content-based speech restrictions in limited public forums, is inapplicable because "trademark registration is not a limited public forum." *Id.* at 1345–48. Justice Kagan's opinion for the Supreme Court did not in any way disturb or disagree either of this Court's conclusions. Thus, under the precedent of this Court, neither the government-subsidy doctrine nor the limited-public-forum doctrine may justify application of the statute in this case.

*Second*, even setting aside the continuing precedential value of this Court's decisions in *Tam* in *Brunetti*, their reasoning should be followed because it is correct. "Unlike trademark registration, the programs at issue in the Supreme Court's cases upholding the constitutionality of conditions under the Spending Clause necessarily and directly implicate Congress's power to spend or control government property." *Id.* at 1343 (distinguishing *Rust v. Sullivan*, 500 U.S. 173 (1991), and similar cases on this

---

[3] So if the government were to make the argument again, it would be "neither the first, nor the second, but the third time this Court has been asked" to compare trademark registration to a government subsidy. *Cf. South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2102 (2018) (Roberts, C.J., dissenting). "Whatever salience the adage 'third time's a charm' has in daily life, it is a poor guide to [judicial] decisionmaking." *Id.*

ground); *see also Tam*, 137 S. Ct. at 1761 (Alito, J.) (making same point); *Autor v. Pritzker*, 740 F.3d 176, 182–83 (D.C. Cir. 2014) ("The Supreme Court has never extended the subsidy doctrine to situations not involving financial benefits."). "The federal registration of a trademark is nothing like the programs at issue in these cases." *Tam*, 137 S. Ct. at 1761 (Alito, J.). Applicants seeking registration pay the PTO—not the other way around. And although the government might have to spend some amount of money to provide the service of registering marks, "just about every government service requires the expenditure of funds." *Id.* Indeed, "trademark registration is not [even] the only government registration scheme." *Id.* (listing copyrights, patents, and many other programs as examples). "The government's involvement in processing and issuing trademarks," therefore, "does not transform trademark restriction into a government subsidy." *Brunetti*, 877 F.3d at 1344. As a result, the government-subsidy cases "are not instructive in analyzing the constitutionality of restrictions on speech imposed in connection with such services." *Tam*, 137 S. Ct. at 1761 (Alito, J.).

Nor are cases involving limited public forums. The government itself has twice recognized as much. It stated in *Tam* that "it did not believe the forum analysis applied to trademark registration, and in particular that it did not regard the register itself as a forum." *Brunetti*, 877 F.3d at 1346 n.2 (quotation marks omitted). Then it told the Supreme Court in *Brunetti* that "we don't regard [trademark registration] as a limited public forum because the registration program gives significant commercial

46

benefits to registrants, but getting the mark on the PTO's principal or supplemental register is not the way in which [mark holders] would want to communicate with [their] potential customers." Transcript of Oral Argument at 27, *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) (No. 18-302). The government explained that "the way in which [they] would communicate with [] potential customers is by advertisements, promotional materials, placing the goods on shelves." *Id.* Thus, "the register communicates not so much with [potential] customers but with potential infringers," who "might otherwise be tempted" to "use the same mark on their goods." *Id.* at 28.

These concessions are well taken. "Because trademarks are by definition used in commerce, the trademark registration program bears no resemblance to the[] limited public forums" that have been found in previous cases "when the government restricts speech on its own property." *Brunetti*, 877 F.3d at 1346–47. In contrast to those cases, "trademarks exist to convey messages throughout commerce." *Id.* at 1347. By prohibiting registration of a mark, the government is not just prohibiting speech on a single government register, but imposing a significant burden on speech between companies and potential customers that extends across the marketplace. *See id.* at 1348 ("These refusals chill speech anywhere from the Internet to the grocery store."). If "the government's listing of registered trademarks in a database create[d] a limited public forum," moreover, "then every government registration program including titles to land, registration of cars, registration of wills or estates, copyrights, even

marriage licenses could similarly implicate a limited public forum." *Id.* That cannot be right. Were it the law, the consequences for copyright alone would be sweeping.[4]

*Third*, even if the system of trademark registration were properly analyzed as a limited public forum, section 2(c) would still be unconstitutional, at least as applied to marks that express a political opinion about public figures. The government's "power to restrict speech" in a limited forum "is not without limits." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). "[T]he "restriction must be reasonable in light of the purpose served by the forum." *Id.* at 107 (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Section 2(c), as interpreted by the PTO, is unreasonable in light of the purpose of trademark law and foundational First Amendment values. Trademark law exists to prevent source confusion. But again, any legitimate source-confusion concerns that would be addressed by section 2(c) are

---

[4] It is true that Justice Sotomayor, in her concurring and dissenting opinion in *Brunetti*, found merit in comparing trademark registration to "the limited-forum and government-program cases." 139 S. Ct. at 2317. She did so based on her view that, "[j]ust as in [those] cases, some speakers benefit, but no speakers are harmed." *Id.* That comparison is flawed. It overlooks the problems identified above, would apply equally to copyright, and misapprehends the key point that speech *is* harmed when it is denied registration: The denial imposes "a First Amendment burden," *Tam*, 137 S. Ct. at 1767 (Kennedy, J.), because it "favors" some speech and "disfavors" other speech, *Brunetti*, 139 S. Ct. at 2300. Or to use different verbs: Denying registration "disincentivize[s]" the use of a particular mark, *id.* at 2307 (Breyer, J., concurring in part and dissenting in part), and thus "chill[s] speech" throughout the marketplace, *Brunetti*, 877 F.3d at 1348. Even Justice Breyer, the only Justice who joined Justice Sotomayor's opinion, recognized in a separate opinion that "the trademark statute does not clearly fit within any of the existing outcome-determinative categories." *Brunetti*, 139 S. Ct. at 2306 (Breyer, J., concurring in part and dissenting in part).

already separately, and directly, addressed by section 2(a). And again, the PTO's interpretation of section 2(c)—to target speech about public figures, and to impose special restrictions on speech about the president alone—turns the First Amendment on its head, and in doing so is at war with its core animating principles.[5]

In short, all paths lead to the same place: Section 2(c) may not be applied to the proposed mark without violating the First Amendment.

## CONCLUSION

The decision of the Trademark Trial and Appeal Board should be reversed.

Respectfully submitted,

*/s/ Jonathan E. Taylor*
JONATHAN E. TAYLOR
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
(202) 888-7792 (fax)
*jon@guptawessler.com*

February 3, 2021                    *Counsel for Appellant*

---

[5] For these reasons, application of section 2(c) to this case would also fail Justice Breyer's test, under which courts would "focus on the interests the First Amendment protects and ask a more basic proportionality question: Does the regulation at issue work harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives?" *Brunetti*, 139 S. Ct. at 2306 (cleaned up).

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,595 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Baskerville font.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2021, I electronically filed the foregoing opening brief with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit by using the CM/ECF system. All participants have consented to service by electronic mail:

Christina J. Heiber, *christina.hieber@uspto.gov*
Thomas W. Krause, *thomas.krause@uspto.gov*
Farheena Yasmeen Rasheed, *farheena.rasheed@uspto.gov*
Molly R. Silfen, *molly.silfen@uspto.gov*

*Counsel for Appellee*

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor

# Addendum

TTAB Opinion (07/02/2020) ...............................................................Appx1

USPTO Final Action (10/07/2019) ..............................................Appx732

> This Opinion is Not a
> Precedent of the TTAB

Mailed: July 2, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Steve Elster*

_____

Serial No. 87749230

_____

Steve Elster, Esq., *pro se*.

Amy Kertgate, Trademark Examining Attorney, Law Office 113,
    Myriah Habeeb, Managing Attorney.

_____

Before Rogers, Chief Administrative Trademark Judge, and
        Zervas and Lynch, Administrative Trademark Judges.

Opinion by Lynch, Administrative Trademark Judge:

## I.    Background

Steve Elster ("Applicant") seeks registration on the Principal Register of the

mark TRUMP TOO SMALL, in standard characters, for:

> Shirts; Shirts and short-sleeved shirts; Graphic T-shirts;
> Long-sleeved shirts; Short-sleeve shirts; Short-sleeved

Serial No. 87749230

> shirts; Short-sleeved or long-sleeved t-shirts; Sweat
> shirts; T-shirts; Tee shirts; Tee-shirts; Wearable garments
> and clothing, namely, shirts in International Class 25.[1]

The Examining Attorney refused registration of Applicant's proposed mark under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that it comprises matter that may falsely suggest a connection with President Donald J. Trump, and under Section 2(c), 15 U.S.C. § 1052(c), on the ground that it comprises his name without his written consent. Applicant has appealed, and the appeal has been fully briefed.[2]

We affirm the Section 2(c) refusal, as explained below, and we need not reach the refusal under Section 2(a)'s false association clause. *See In re Society of Health and Physical Educators*, 127 USPQ2d 1584, 1590 (TTAB 2018).

## II.    Section 2(c) Refusal

Section 2(c) of the Trademark Act precludes, in relevant part, registration of a mark that "[c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent." 15 U.S.C. § 1052(c). "A key purpose of requiring the consent of a living individual to the registration of his or her name, signature, or portrait is to protect rights of privacy and publicity that living persons have in the designations that identify them." *In re ADCO Indus.-*

---

[1] Application Serial No. 87749230 has a filing date of January 10, 2018, and is based on Applicant's assertion of a bona fide intent to use the mark in commerce under Trademark Act Section 1(b), 15 U.S.C. § 1051(b).

[2] The record includes Applicant's original Brief, 11 TTABVUE, a Supplemental Brief, 16 TTABVUE, submitted following a remand sought by the Examining Attorney to add an additional ground for refusal (the refusal under Section 2(a)), the Examining Attorney's Brief, 19 TTABVUE, and Applicant's Reply Brief, 20 TTABVUE.

Serial No. 87749230

*Techs., L.P.*, 2020 USPQ2d 53786, *20 (TTAB 2020) (citations omitted). Another is

to "protect[] consumers against source deception." *Id.* at *29.

For names, the statute requires that the matter sought to be registered include

the name of a particular living individual, rather than merely include words that

only by coincidence happen to be someone's name but which the relevant public

generally would not recognize as that living individual's name. *Martin v. Carter*

*Hawley Hale Stores, Inc.*, 206 USPQ 931, 933 (TTAB 1979). To address the scenario

in which the name would not be recognized as identifying the individual, Section

2(c) has been interpreted to mean that when a name appears in a proposed mark,

the written consent of the person with that name must be supplied where: (1) the

public would reasonably assume a connection between the individual and the goods

or services because the individual is so well known; or (2) the individual is publicly

connected with the business in which the mark is used. *ADCO*, 2020 USPQ2d 53786

at *22; *see also Martin v. Carter Hawley Hale Stores,* 206 USPQ at 932-33

("requirement for consent depends upon a determination of whether the mark would

be recognized and understood by the public as identifying the person").

> Thus, for example, although the mark[s] "FANTA" and
> "ARNOLD BRAND" happened to be the names of
> individuals [i.e., Robert D. Fanta, a tax accountant, who
> sought to cancel registrations of the mark "FANTA" for
> soft drinks and for carbonated soft drink and syrup
> concentrate for making the same, and Arnold Brand, a
> patent and trademark attorney active in civic affairs, who
> sought to cancel a registration of a mark containing the
> words "ARNOLD BRAND" for fresh tomatoes] who were
> undoubtedly well known in their own spheres,
> nevertheless, in each case, it was found that the
> individual in question would not be likely to suffer any

Serial No. 87749230

> damage from the registration of the mark at issue because
> he had never attained any recognition in the field of
> business in which the mark was used.

*Id.* at 933 (footnotes omitted) (citing *Fanta v. The Coca-Cola Co.*, 140 USPQ 674 (TTAB 1964) and *Brand v. Fairchester Packing Co.*, 84 USPQ 97 (Comm'r Pat. 1950)).

It is undisputed in this case, and we find, that Applicant's proposed mark includes the surname of President Donald J. Trump. Section 2(c) applies to a proposed mark that includes a particular living individual's surname if the individual is known by that surname alone. *In re Hoefflin,* 97 USPQ2d 1174, 1176 (TTAB 2010) ((holding registration of the marks OBAMA PAJAMA and OBAMA BAHAMA PAJAMAS barred under Section 2(c) because "this statutory sub-section operates to bar the registration of marks containing not only full names, but also surnames … so long as the name in question does, in fact, 'identify' a particular living individual"); *see also In re Nieves & Nieves LLC*, 113 USPQ2d 1629, 1638 (TTAB 2015) (relevant inquiry is "whether the public would recognize and understand the mark as identifying a particular living individual"). The record in this case includes extensive evidence that the public understands "Trump" alone as a reference to President Donald Trump.[3] Significantly, Applicant clearly concedes that his mark "explicitly refers to declared presidential candidate and President

---

[3] E.g., February 19, 2018 Office Action at 6-7; July 30, 2018 Office Action at 57, 65, 67-130; February 25, 2019 Office Action at 5, 11, 24, 31, 54, 57, 59, 61, 63, 65, 69, 71-74; June 24, 2019 Office Action at 17, 25, 32, 41, 51, 116-42.

Serial No. 87749230

Donald Trump."[4] The application record does not include a written consent from President Trump, and Applicant makes no argument to the contrary.

Despite Applicant's direct acknowledgment that his mark includes a name that identifies a particular living individual without his consent, Applicant contends that his mark does not violate Section 2(c) because the relevant public would not presume a connection between President Trump and the goods. According to Applicant, given "how [Donald Trump] depicts himself generally," the mark in its entirety is "the antithesis of what consumers would understand to be sponsored by, approved by, or supported by Donald Trump."[5] Applicant essentially argues that while President Trump strives to make a grandiose impression, Applicant's mark as a whole conveys that some features of President Trump and his policies are diminutive.[6] Therefore, Applicant maintains that his mark lacks the necessary connection to the goods under Section 2(c).

Applicant couches the public perception of a connection as a separate inquiry under Section 2(c), but as noted above, the analysis of a connection under the test set forth above regarding Section 2(c) really is just part of determining whether the public would perceive the name in the proposed mark as identifying a particular

---

[4] 16 TTABVUE 7 (Applicant's Supplemental Brief).

[5] 16 TTABVUE 20 (Applicant's Supplemental Brief).

[6] Both Applicant and the Examining Attorney discuss and offer evidence that the 2016 presidential campaign included some widely publicized colloquies, some of which Mr. Trump participated in, about the size of certain parts of his anatomy, such as his hands, which then-presidential candidate Marco Rubio asserted were too small. July 8, 2018 Response to Office Action at 8-24; February 25, 2019 Office Action at 5-7, 24-27. Applicant also submitted evidence of media articles about President Trump's policies in terms of small size, with headlines such as "The Shrinking of America" and "Trump Orders Largest National Monument Reduction in U.S. History." *Id.* at 26, 31.

Serial No. 87749230

living individual. In this case, Applicant already has conceded this point. Unlike

Section 2(a)'s explicit statutory requirement that the matter in question "falsely

suggest a connection," Section 2(c) prohibits registration of any proposed mark that

"consists of or comprises a name … identifying a particular living individual except

by his written consent." 15 U.S.C. §§ 1052(a) & (c). The prohibition applies

regardless of whether there is a suggested connection. As explained in *Martin v.*

*Carter Hawley Hale Stores,* 206 USPQ at 933:

> [I]t is more than likely that any trademark which is
> comprised of a given name and surname will, in fact, be
> the name of a real person. But that coincidence, in and of
> itself, does not give rise to damage to that individual in
> the absence of other factors from which it may be
> determined that the particular individual bearing the
> name in question will be associated with the mark as used
> on the goods, either because that person is so well known
> that the public would reasonably assume the connection
> or because the individual is publicly connected with the
> business in which the mark is used.

By analogy, the Board in *Hoefflin* held that an application to register OBAMA

PAJAMA for pajamas, sleepwear and underwear was barred by Section 2(c) even if

"the record does not support the conclusion that President Obama is in any way

connected with [such goods]." 97 USPQ2d at 1177. The Board addressed the fame of

a President of the United States, stating that "well-known individuals such as

celebrities and world-famous political figures are entitled to the protection of

Section 2(c) without having to evidence a connection with the involved goods or

services." *Id.* The evidentiary record in this case clearly shows that President

Trump is extremely well known, not only because of his political office but also

because of his prior celebrity.[7] Moreover, even if some further connection to the types of goods identified need be shown, the record reflects that through business enterprises, President Trump's surname has been used as a brand on a wide variety of goods, including shirts.[8]

With a proposed mark such as this one that names someone very well-known such as President Trump, and as Applicant has admitted, there is no question that the public would view the name in question as the name of a particular living individual. As in *ADCO*, decided on a very similar evidentiary record to the one in this case, we find that the proposed mark including TRUMP "identif[ies] Donald Trump, whose identity is renowned. By any measure, … Donald Trump is a well-known political figure and a celebrity." *ADCO*, 2020 USPQ2d 53786 at *24. Thus, the necessary connection for purposes of Section 2(c) exists. Accordingly, in applying Section 2(c) in this case, we need not probe for a Section 2(a)-type connection as Applicant suggests, but rather just a showing that the relevant public would recognize the name in the mark as that of a particular living individual. Therefore, we reject Applicant's contention that under Section 2(c) a "connection" is necessary, but is foreclosed based on the theory that President Trump would not endorse the message allegedly conveyed by TRUMP TOO SMALL.

---

[7] February 19, 2018 Office Action at 45-64 (Time Magazine 2016 Person of the Year); July 30, 2018 Office Action at 51-52 (CBS Los Angeles article about altercation at Donald Trump's Walk of Fame Star); *id.* at 65-133 (various articles in mainstream media about Donald Trump); June 24, 2019 Office Action at 9-144 (various articles in mainstream media about Donald Trump).

[8] February 19, 2018 Office Action at 14-16, 65, 76; February 25, 2019 Office Action at 52; June 24, 2019 Office Action at 145-99; October 7, 2019 Office Action at 5-50.

Serial No. 87749230

## III.    Constitutional Challenge to Section 2(c)

Applicant's appeal focuses primarily on assertions that the statutory refusals to register applied in this case are unconstitutional because they violate his right to free speech under the First Amendment. Applicant alleges that Section 2(a)'s false association provision and Section 2(c)'s particular living individual provision constitute content-based restrictions on private speech, subject to strict scrutiny. According to Applicant, the prohibitions are not narrowly tailored to a compelling state interest, and cannot be justified, in particular when applied to current or former presidents, or presidential candidates, whom Applicant claims have yielded rights of privacy and publicity by seeking the office. Applicant insists that "Presidential candidates and current and former Presidents also invite widespread use of their names and identities in products and services that comment upon the candidates and Presidents in personal and/or political terms."[9]

The recent *ADCO* case on proposed marks that included TRUMP[10] involved similar constitutionality challenges to Section 2(c) and Section 2(a)'s false association provision. *ADCO Indus.-Techs.*, 2020 USPQ2d 53786 at *25. The Board in *ADCO* stated that regardless of the USPTO's inability to strike down statutory provisions as unconstitutional, "a constitutional challenge may involve 'many

---

[9] 16 TTABVUE at 21.

[10] The marks at issue in *ADCO* were  and                                    .

Serial No. 87749230

threshold questions . . . to which the [agency] can apply its expertise." *Id.* at *26 (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 16, 22-23, 132 S. Ct. 2126 (2012)). Accordingly, the Board explained why it does "not agree with Applicant's challenges based on our experience with Section 2 of the Trademark Act and the purposes underlying it." *ADCO Indus.-Techs.*, 2020 USPQ2d 53786 at *27 (citations omitted).

As a threshold matter, the Board pointed out that these provisions of the Trademark Act do not control an applicant's use of a proposed mark, but only set criteria for trademark registration. *Id.* Therefore, contrary to Applicant's assertions, Sections 2(a) and 2(c) are not direct restrictions on speech. *Id.* Next, the Board addressed the viewpoint-neutrality of Section 2(a)'s false association clause and Section 2(c), thereby distinguishing them from Section 2(a)'s disparagement and immoral/scandalous provisions struck down by the Supreme Court as viewpoint-discriminatory. *Id.* ("the Supreme Court pointedly refrained from extending its holdings to any provisions of the Lanham Act that do not discriminate based on the applicant's viewpoint"), *citing Iancu v. Brunetti*, 139 S. Ct. 2294, 2019 USPQ2d 232043 at *7, n.*(2019) (addressing immoral/scandalous clause of Section 2(a), noting "Nor do we say anything about how to evaluate viewpoint-neutral restrictions on trademark registration.") and *id.* at 2303 (Alito, J., concurring) (emphasizing that the Court's holding turned entirely on the conclusion that the invalidated provision was viewpoint discriminatory); *see also Matal v. Tam*, 137 S. Ct. 1744, 122 USPQ2d 1757 (2017) (addressing disparagement clause of Section 2(a)). As the *Brunetti* Court characterized the holding in *Tam*, "all Members of the

Serial No. 87749230

Court agreed that the [disparagement] provision violated the First Amendment because it discriminated on the basis of viewpoint." *Brunetti*, 2019 USPQ2d 232043 at *2. Similarly, the *Brunetti* Court held that the immoral/scandalous provision "infringes the First Amendment for the same reason: It too disfavors certain ideas." *Id.* Clearly, Section 2(c) differs, in that the prohibition applies in an objective, straightforward way to any proposed mark that consists of or comprises the name of a particular living individual, regardless of the viewpoint conveyed by the proposed mark.

Finally, the Board in *ADCO* opined that even if the challenged provisions of Section 2(a) and Section 2(c) were considered as restrictions on speech, they do not run afoul of the First Amendment because "Congress acts well within its authority when it identifies certain types of source-identifiers as being particularly susceptible to deceptive use and enacts restrictions concerning them." *ADCO Indus.-Techs.,* 2020 USPQ2d 53786 at *29 (citation omitted), *citing S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 107 S. Ct. 2971, 3 USPQ2d 1145, 1153 (1987) ("Congress reasonably could conclude that most commercial uses of the Olympic words and symbols are likely to be confusing."). Both of the statutory provisions at issue "recognize[] the right of privacy and publicity that a living person has in his or her identity and protect[] consumers against source deception." *ADCO Indus.-Techs.,* 2020 USPQ2d 53786 at *29.

Thus, even if Section 2(c) were subject to greater scrutiny, as Applicant alleges, the statutory provision is narrowly tailored to accomplish these purposes, and

consistently and reliably applies to any mark that consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent.

**Decision**: We affirm the refusal to register the proposed mark under Section 2(c) on the ground that it comprises the name of President Donald Trump without his written consent. We do not reach the refusal to register under Section 2(a)'s false association clause.

| | |
|---|---|
| **To:** | Elster, Steve (steve03594@gmail.com) |
| **Subject:** | U.S. Trademark Application Serial No. 87749230 - TRUMP TOO SMALL - N/A |
| **Sent:** | October 07, 2019 07:20:10 AM |
| **Sent As:** | ecom113@uspto.gov |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |
| | Attachment - 21 |
| | Attachment - 22 |
| | Attachment - 23 |
| | Attachment - 24 |
| | Attachment - 25 |
| | Attachment - 26 |
| | Attachment - 27 |
| | Attachment - 28 |
| | Attachment - 29 |
| | Attachment - 30 |
| | Attachment - 31 |
| | Attachment - 32 |
| | Attachment - 33 |
| | Attachment - 34 |
| | Attachment - 35 |
| | Attachment - 36 |
| | Attachment - 37 |
| | Attachment - 38 |
| | Attachment - 39 |
| | Attachment - 40 |
| | Attachment - 41 |
| | Attachment - 42 |
| | Attachment - 43 |
| | Attachment - 44 |

Attachment - 45
Attachment - 46

**United States Patent and Trademark Office (USPTO)**
**Office Action (Official Letter) About Applicant's Trademark Application**

**U.S. Application
Serial No.** 87749230

**Mark:** TRUMP TOO
SMALL

**Correspondence
Address:**
STEVE ELSTER
785/E2 OAK GROVE
ROAD #201
CONCORD, CA
94518

**Applicant:** Elster,
Steve

**Reference/Docket No.**
N/A

**Correspondence
Email Address:**

steve03594@gmail.com

# FINAL OFFICE ACTION

**The USPTO must receive applicant's response to this letter within  six months of the issue date below or the application will be
abandoned.** Respond using the Trademark Electronic Application System (TEAS) and/or Electronic System for Trademark Trials and Appeals
(ESTTA).  A link to the appropriate TEAS response form and/or to ESTTA for an appeal appears at the end of this Office action.

**Issue date:  October 07, 2019**

On June 3, 2019, the Trademark Trial and Appeal Board (Board) suspended applicant's appeal and remanded the application to the trademark
examining attorney for further examination.  Subsequently, the trademark examining attorney issued a new non-final Office action on June 24,
2019, refusing registration pursuant to Trademark Act Section 2(a) because the applied-for mark consists of or includes matter which may falsely
suggest a connection with Donald Trump ("false connection" refusal), requesting information regarding the relationship between the applicant
and President Trump, and maintaining all the issues in the final Office action.  On September 9, 2019, applicant filed a response addressing the
Section 2(a) refusal and the information request.

Based on applicant's response, the requirement for information regarding the relationship between applicant and person named in mark has been
**SATISFIED.**  *See* TMEP §§713.02, 714.04.

With respect to the Section 2(a) "false connection" refusal, the trademark examining attorney has carefully reviewed applicant's most recent
response.  In the response, applicant addresses the new refusal by stating that the refusal to register a mark that may falsely suggest a connection
with a person, institution, belief or national symbol is a content-based regulation of private speech that does not meet strict scrutiny.  However,
applicant's arguments do not obviate the "false connection" refusal because (1) applicant has submitted no evidence or relevant legal basis in
support of its assertions in this regard, and (2) in any event, the Trademark Trial and Appeal Board has no authority to rule on the
constitutionality of the Trademark Act.

Applicant contends that (1) the "false connection" refusal under Trademark Act Section 2(a) is a content-based regulation of private speech that
is subject to strict scrutiny, (2) the government must prove that the "false connection" refusal satisfies strict scrutiny, and (3) the government has

not met its burden of proof.  Response of September 9, 2019 at 3-4.  These arguments are unpersuasive.

Applicant cites *Matal v. Tam*[1], *Reed v. Town of Gilbert*[2], and *United States v. Alvarez*[3] in support of its assertions regarding the constitutionality of the "false connection" refusal.  The cited opinions, however, are distinguishable on their facts and applicant's reliance thereon is misplaced.[4]  Indeed, Justice Kennedy's opinion in  *Matal v. Tam* expressly states that "[t]his case does not present the question of how other provisions of the Lanham Act should be analyzed under the First Amendment."  137 S. Ct. at 1768.

Without any relevant legal basis to support them, applicant's arguments regarding the constitutionality of the "false connection" provision of Section 2(a) amount to little more than unsubstantiated rhetoric.  *See In re Simulations Publications, Inc.,* 521 F.2d 797, 187 USPQ 147, 148 (CCPA 1975) (assertions in briefs are not evidence); *In re Vesoyuzny Ordena Trudovogo Krasnogo Znameni,* 219 USPQ 69, 70 (TTAB 1983) (assertions in briefs are not evidence); *see also Cai v. Diamond Hong, Inc.* 901 F.3d 1367, 1371 (Fed. Cir. 2018) (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.,* 424 F.3d 1276, 1285 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence"));  *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1339 (Fed. Cir. 2004) ("Statements of counsel, however, are not evidence.").

Although applicant's response is directed virtually entirely to the constitutionality of the "false connection" provision of Trademark Act Section 2(a), the Trademark Trial and Appeal Board is an administrative tribunal, not an Article III court, and is empowered to determine only the right to register a mark.  TBMP §102.01 (citing Trademark Act Section 17, 15 U.S.C. §1067; Trademark Act Section 18, 15 U.S.C. §1068; Trademark Act Section 20, 15 U.S.C. §1070; Trademark Act Section 24, 15 U.S.C. §1092).  As such, the Board has no authority to declare provisions of the Trademark Act unconstitutional.  *In re District of Columbia,* 101 USPQ2d 1588, 1602 (TTAB 2012 (no authority to declare provisions of the Trademark Act unconstitutional), *aff'd sub nom, In re City of Houston,*  731 F.3d 1326, 108 USPQ2d 1226 (Fed. Cir. 2013); *Blackhorse v. Pro-Football Inc.,* 98 USPQ2d 1633, 1638 (TTAB 2011 (no authority to rule on the constitutionality of the Trademark Act on its face or as applied); *Harjo v. Pro-Football, Inc.,* 50 USPQ2d 1705, 1710 (TTAB 1999) (no authority to declare provisions of the Trademark Act unconstitutional or to determine whether Trademark Act 2(a) is overbroad or vague), *rev'd on other grounds,*  284 F. Supp. 96, 68 USPQ2d 1225 (D.D.C. 2003).

In the present case, the evidentiary record aptly demonstrates the fame of President Trump and the wide variety of goods in the marketplace that bear the TRUMP mark.  *See also, e.g.*:

Trump Store
https://www.trumpstore.com/collections/headwear
https://www.trumpstore.com/collections/women
https://www.trumpstore.com/collections/home
https://www.trumpstore.com/collections/home-bath-body
https://www.trumpstore.com/collections/home-luggage-travel
https://www.trumpstore.com/collections/trump-golf-headcovers
https://www.trumpstore.com/collections/trump-golf-towels-pin-flags
https://www.trumpstore.com/collections/trump-golf-accessories
https://www.trumpstore.com/collections/on-the-go

If applicant's goods are of a type that the named person or institution sells or uses, and the named party is sufficiently famous, then it may be inferred that purchasers of the goods would be misled into making a false connection of sponsorship, approval, support or the like with the named party.  *See, e.g., In re Nieves & Nieves LLC,* 113 USPQ2d 1639, 1647-48 (TTAB 2015) (holding ROYAL KATE used with applicant's consumer products, including fashion products, suggested a connection with Kate Middleton would be inferred because evidence showed that Kate Middleton, by virtue of being the wife of Prince William of the British Royal family, has become a celebrity and fashion trend-setter the media reports on, including the clothes she wears, what she does, and what she buys); *In re Cotter & Co.,* 228 USPQ 202, 204-05 (TTAB 1985) (holding WESTPOINT used with applicant's firearms suggested sponsorship, approval, support or the like from West Point because evidence showed that West Point is a well-known U.S. Military Academy).  Here, the record is replete with evidence demonstrating that President Trump sells clothing under the TRUMP mark.

Moreover, applicant's  response indicates that applicant does intend to trade upon the goodwill of Donald Trump.  Specifically, applicant admits that the applied-for mark references "presidential candidate and president Donald Trump."  Response at 1.  Indeed, it is difficult to imagine any other purpose for using the name "TRUMP"  on apparel except to draw the connection between President Trump and applicant's  products.  While intent to identify a party or trade on its goodwill is not a required element of a §2(a) claim of false suggestion of an association with such a party, the Board has held that evidence of such intent is highly probative that the public would make the intended false association.  *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.,* 703 F.2d 1372, 1377 (Fed. Cir. 1983); TMEP §1203.03(c)(i).

The evidence of record establishes that Donald Trump is a famous political figure by virtue of who he is, namely, the President of the United States.  In view of the fame of President Trump and the vast array of goods bearing the TRUMP mark to which consumers are exposed in the marketplace, a connection with the President would be presumed when applied-for mark TRUMP TOO SMALL is used on applicant's goods.

For all of the foregoing reasons, and those submitted in the previous Office action (incorporated herein by reference), all four of the relevant factors weigh in favor of finding that the applied-for mark consists of or include matter which may falsely suggest a connection with Donald Trump, President of the United States.  Accordingly, the refusal pursuant to Trademark Act Section 2(a) is maintained and now made **FINAL**.

In addition, applicant's response does not resolve the other issues in final status because applicant, in responding to the "false connection" refusal, has merely provided arguments and analysis that were raised previously.  Therefore, the Section 2(c) refusal raised in the final Office action that issued on July 30, 2018 remains outstanding.

Because applicant's response does not resolve all outstanding refusals nor otherwise put the application in condition for publication or registration, the trademark examining attorney is holding the following issues final, including the Section 2(a) "false connection" refusal raised in the previous Office action dated June 24, 2019.  *See* 37 C.F.R. §§2.63(b), 2.142(d); TMEP §715.04(b).

The following issues are in final status:

- ·  Section 2(a) refusal – False Suggestion of an Association
- ·  Section 2(c) refusal – Name Identifying a Particular Living Individual

The Board has been notified to resume the appeal.  *See* TMEP §715.04(b).

/Amy Kertgate/
Examining Attorney
Law Office 113
Tel: (571) 272-1943
Email: amy.kertgate@uspto.gov

## RESPONSE GUIDANCE

- • **Missing the response deadline to this letter will cause the application to abandon**.  A response or notice of appeal must be received by the USPTO before midnight **Eastern Time** of the last day of the response period.  TEAS and ESTTA maintenance or unforeseen circumstances could affect an applicant's ability to timely respond.

- • **Responses signed by an unauthorized party** are not accepted and can **cause the application to abandon**.  If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with legal authority to bind a juristic applicant.  If applicant has an attorney, the response must be signed by the attorney.

- • If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.

---

[1] *Matal v. Tam,* 137 S. Ct. 1744 (2017)
[2] *Reed v. Town of Gilbert,* 135 S. Ct. 2218 (2015)
[3] *United States v. Alvarez,* 132 S. Ct. 2537 (2012)
[4] *See Matal v. Tam,* 137 S. Ct. at 1757-1767 (invalidating in a plurality opinion the Lanham Act's  bar on the registrability of "disparag[ing]"  trademarks under Section 2(a), holding that the provision violated the First Amendment because it discriminates on the basis of viewpoint); *Reed v. Town of Gilbert,* 135 S. Ct. 2218 (holding provisions of a town's  sign code, which imposed more stringent restrictions on signs directing the public to a meeting of a nonprofit group than it did on signs conveying other messages, were content-based regulations of speech because the restrictions in the sign code that applied to any given sign depended entirely on the communicative content of the sign); *United States v. Alvarez,* 132 S. Ct. 2537 (holding that the Stolen Valor Act, which makes it a crime to falsely claim receipt of military decorations or medals, infringes upon speech protected by the First Amendment).

| | |
|---|---|
| **To:** | Elster, Steve (steve03594@gmail.com) |
| **Subject:** | U.S. Trademark Application Serial No. 87749230 - TRUMP TOO SMALL - N/A |
| **Sent:** | October 07, 2019 07:20:13 AM |
| **Sent As:** | ecom113@uspto.gov |
| **Attachments:** | |

### United States Patent and Trademark Office (USPTO)

## USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on **October 07, 2019** for
**U.S. Trademark Application Serial No.** 87749230

Your trademark application has been reviewed by a trademark examining attorney.  As part of that review, the assigned attorney has issued an official letter that you must respond to by the specified deadline or your application will be abandoned.  Please follow the steps below.

**(1)  Read the official letter.**

**(2)  Direct questions** about the contents of the Office action to the assigned attorney below.

Kertgate, Amy
/Amy Kertgate/
Examining Attorney
Law Office 113
Tel: (571) 272-1943
Email: amy.kertgate@uspto.gov

Direct questions about navigating USPTO electronic forms, the USPTO website, the application process, the status of your application, and/or whether there are outstanding deadlines or documents related to your file to the Trademark Assistance Center (TAC).

**(3)  Respond within 6 months** (or earlier, if required in the Office action) from **October 07, 2019**, using the Trademark Electronic Application System (TEAS).  The response must be received by the USPTO before midnight **Eastern Time** of the last day of the response period.  See the Office action for more information about how to respond.

## GENERAL GUIDANCE

·    **Check the status** of your application periodically in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

·    **Update your correspondence email address,** if needed, to ensure you receive important USPTO notices about your application.

·    **Beware of misleading notices sent by private companies about your application.**  Private companies not associated with the USPTO use public information available in trademark registrations to mail and email trademark-related offers and notices – most of which require fees. All **official USPTO correspondence** will only be **emailed from the domain "@uspto.gov."**